# R. J. REYNOLDS TOBACCO CO. *v.* DURHAM COUNTY, NORTH CAROLINA, ET AL.

No. 85–1021.   Argued October 6, 1986—Decided December 9, 1986*

*Together with No. 85–1022, *R. J. Reynolds Tobacco Co.* v. *Durham County, North Carolina, et al.*, on appeal from the Court of Appeals of North Carolina.

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Erwin N. Griswold* argued the cause for appellant in both cases. With him on the briefs were *Bob C. Griffo, Hugh Calkins, Kathleen B. Burke, John C. Duffy, Jr., James W. McGrath, Thomas L. Kummer,* and *John A. Cocklereece, Jr.*

*Rex E. Lee* argued the cause for appellees in both cases. With him on the brief were *Carter G. Phillips, S. C. Kitchen, Thomas Russell Odom, P. Eugene Price, Jr., Jonathan V. Maxwell,* and *John G. Wolfe III.*†

JUSTICE BLACKMUN delivered the opinion of the Court.

This case[1] presents the narrow but important question whether a State may impose a nondiscriminatory ad valorem property tax on imported goods stored under bond in a cus-

---

†*Benna Ruth Solomon* and *Beate Bloch* filed a brief for the National Association of Counties et al. as *amici curiae* urging affirmance.

[1] Although there are two appeals (by the same appellant), there is but one case. See Part II, *infra.*

toms warehouse and destined for domestic manufacture and sale.

I

Appellant R. J. Reynolds Tobacco Company is a New Jersey corporation with its principal office in Winston-Salem, N. C. Reynolds manufactures finished tobacco products for sale to distributors and other authorized purchasers. App. to Juris. Statement 26a. Virtually all its products are consumed in the United States. *Id.*, at 31a. Its only manufacturing facilities are in Winston-Salem, where it blends imported tobacco with domestic tobacco in its manufacturing process.[2]

The foreign tobacco is shipped to a port of entry in the United States and is placed under customs bond given by Reynolds to secure the payment of federal import duties. See 19 U. S. C. § 1555 (1982 ed., Supp. III). The tobacco is then transported by truck or rail to one or more of the 88 customs-bonded warehouses owned and maintained by Reynolds in Forsyth and Durham Counties, N. C.[3] Because

---

[2] The imported tobacco comes from Bulgaria, Syria, Lebanon, Brazil, and a few other places. App. to Juris. Statement 29a.

[3] Pursuant to federal regulation, a private party may have a building or part of a building designated as a customs-bonded warehouse for the purpose of storing imported goods. See 19 U. S. C. §§ 1555–1565 (1982 ed. and Supp. III); 19 CFR §§ 19.1–19.12 (1986). A customs officer supervises the operation of the warehouse, although labor on the stored merchandise is performed by the proprietor. The regulations prescribe, among other things, the manner in which goods enter and leave the warehouse, § 19.6, the records the proprietor must keep, § 19.12, and the supervision the customs officer is to perform, § 19.4.

Customs warehouses are divided into eight classes. § 19.1(a). Reynolds has two types, Class 2 and Class 8. Its Class 8 warehouses are storage sheds for the cleaning, sorting, and repacking of tobacco. See § 19.1(a)(8). Its Class 2 warehouses are used exclusively for the storage of tobacco. See § 19.1(a)(2). It is customary for Reynolds in the course of its manufacturing process to move imported tobacco from storage in its Class 8 warehouses to its Class 2 warehouses located in Reynolds' manufacturing areas. App. to Juris. Statement 30a. Reynolds owns these warehouses and the

nearly all imported tobacco requires aging, it is usually in the warehouses for two years. Reynolds pays the required customs duties upon withdrawal of tobacco from the warehouses. Reynolds stores its domestic tobacco in nonbonded warehouses in the same two counties. It receives identical city and county police, fire, and other public services at its customs-bonded and nonbonded warehouses. App. to Juris. Statement 32a.

Tobacco present in North Carolina on January 1 of each year is subject to an ad valorem property tax in the amount of 60% of the rate generally applicable to other property.[4] See N. C. Gen. Stat. §§ 105–277(a) and 105–285 (1985). Counties and municipalities are authorized to levy and collect property taxes, but they must do so in a manner uniform throughout the State. See § 105–272. In listing its taxable personal property for 1983 in Durham and Forsyth Counties, Reynolds claimed that, under this Court's ruling in *Xerox Corp.* v. *County of Harris*, 459 U. S. 145 (1982), its imported tobacco in customs-bonded warehouses was immune from taxation on federal constitutional grounds. App. 4–13. The tax supervisors for the respective counties denied this claim, and the County Boards of Equalization and Review upheld the denials. *Id.*, at 15–23.

Reynolds then filed appeals (consolidated for hearing) with the North Carolina Property Tax Commission, sitting as the State Board of Equalization and Review. Reynolds again

---

land thereunder, is their sole user, and pays all maintenance expenses and property taxes on them. *Id.*, at 30a, 32a.

Goods may remain in a customs-bonded warehouse for up to five years from the date of importation without payment of customs duties. 19 U. S. C. § 1557(a). Once goods are withdrawn, however, duties are due unless the goods are to be exported. *Ibid.* When Reynolds is ready to use imported tobacco, its practice is to pay the duty and to move the tobacco out of the Class 2 areas in order to process it with domestic tobacco. App. 90. When this move has been made, the imported tobacco is incorporated in the finished tobacco products within two weeks. *Id.*, at 91.

[4] There is no equal protection issue in this case.

contended that the taxation of the imported tobacco was at odds with *Xerox*. The Commission, however, found *Xerox* distinguishable because the warehoused goods under consideration in that case were destined for foreign markets and were lodged only temporarily in customs-bonded warehouses in this country, whereas Reynolds' tobacco was not so destined and had "nothing temporary about its existence in this country." App. to Juris. Statement 35a–36a. The Commission, *id.*, at 36a, likened the Reynolds facts, instead, to those of *American Smelting & Refining Co.* v. *County of Contra Costa*, 271 Cal. App. 2d 437, 77 Cal. Rptr. 570 (1969), appeal dism'd, 396 U. S. 273 (1970), where a nondiscriminatory tax on imported goods stored in customs-bonded warehouses and destined for domestic consumption was upheld.

The North Carolina Court of Appeals affirmed the Commission's decision. *In re R. J. Reynolds Tobacco Co.*, 73 N. C. App. 475, 326 S. E. 2d 911 (1985). The court first rejected Reynolds' contention that the tax violated the Import-Export Clause, because the tax was clearly not an impost or duty. *Id.*, at 478–480, 326 S. E. 2d, at 914–915. The court then distinguished *Xerox*, reasoning that it prohibited state taxation only of goods stored under bond and awaiting export, not of those destined for domestic manufacture and consumption. 73 N. C. App., at 482–483, 326 S. E. 2d, at 916–917. Following the California Court of Appeal's conclusion in *American Smelting* that customs-bonded warehouses were not meant to create a "warehouse enclave" for foreign goods destined to be sold and consumed in domestic commerce, the North Carolina court observed that it would be unfair to "exempt imported tobacco aging in customs bonded warehouses from property taxation while imposing these taxes on domestically-grown tobacco aging in ordinary warehouses." 73 N. C. App., at 483–484, 326 S. E. 2d, at 917. Finally, the court dismissed Reynolds' due process claim, finding that the appropriate test was "'whether the taxing power exerted by the state bears fiscal relation to protection,

opportunities and benefits given by the state.'" *Id.*, at 485, 326 S. E. 2d, at 918, quoting *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444 (1940). Because there was no dispute that the imported tobacco received the benefit of local services, the imposition of the ad valorem tax did not constitute a due process violation. 73 N. C. App., at 485–486, 326 S. E. 2d, at 918.

Reynolds then filed with the North Carolina Supreme Court a notice of appeal and a petition for discretionary review. The Supreme Court granted the counties' subsequent motion to dismiss for lack of a substantial constitutional question and denied Reynolds' petition. *In re R. J. Reynolds Tobacco Co.*, 314 N. C. 540, 335 S. E. 2d 21 (1985).

Reynolds appealed to this Court.[5] We postponed consideration of our jurisdiction to the hearing on the merits. 475 U. S. 1009 (1986).

## II

Under 28 U. S. C. § 1257, appellate jurisdiction lies in this Court to review a "final" judgment "rendered by the highest court of a State in which a decision could be had . . . (2) . . . where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution, treaties or laws of the United States, and the decision is in favor of its validity."

## A

The initial jurisdictional question presented here is whether Reynolds properly challenged the validity of North Carolina's ad valorem property tax and whether there was a final judgment in favor of validity. Because the North Carolina Court of Appeals sustained the tax against Reynolds' claim that, as applied to its imported tobacco, the tax was repugnant to the Import-Export, Supremacy, and Due Process

---

[5] Reynolds took care to file one appeal (No. 85–1021) from the North Carolina Supreme Court and another (No. 85–1022) from the North Carolina Court of Appeals. See App. to Juris. Statement 39a, 41a.

Clauses, and the North Carolina Supreme Court concluded that no substantial constitutional question was raised by the appeal, our appellate jurisdiction would seem to be assured. Appellees contend, however, that jurisdiction under § 1257(2) has not been established because Reynolds failed to make "'an explicit and timely insistence'" in the North Carolina courts that the State's tax statute, as applied to it, violated the Federal Constitution. Brief for Appellees 12, quoting *Charleston Federal Savings & Loan Assn.* v. *Alderson*, 324 U. S. 182, 185 (1945). Appellees argue that Reynolds challenged merely the assessment or levy of the tax by North Carolina authorities, a situation where appellate jurisdiction does not lie. We find the argument unpersuasive.

In *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434 (1979), this Court was faced with a similar challenge to appellate jurisdiction. Appellees in that case asserted that Japanese shipping companies had been denied only a constitutional immunity from taxation for their shipping containers and that the California courts had not sustained the tax statute against federal constitutional attack. See *id.*, at 440. Contrary to that suggestion, this Court found that the appellants had challenged the constitutionality of the tax statute, as applied, and that the California courts had sustained the statute's validity. *Id.*, at 441. We further observed that "a state statute is sustained within the meaning of § 1257(2) when a state court holds it applicable to a particular set of facts as against the contention that such application is invalid on federal grounds." *Ibid.*

The situation presented by the present case is like that in *Japan Line:* Reynolds explicitly drew the ad valorem property tax, as applied to its imported tobacco, into constitutional question, and the North Carolina courts upheld the validity of the tax. See also *Xerox Corp.* v. *County of Harris*, 459 U. S., at 149; *McCarty* v. *McCarty*, 453 U. S. 210, 219, n. 12 (1981). Thus, under § 1257(2), there was a final state-

court judgment in favor of the validity of the tax, and Reynolds properly challenged it.

## B

Reynolds draws our attention to a jurisdictional detail that is unresolved.  It has not been made clear which North Carolina court, in circumstances like those present here, is the "highest court" from which an appeal lies under § 1257. North Carolina, with exceptions not pertinent here, gives a litigant an appeal of right to its Supreme Court from any decision of its Court of Appeals that "directly involves a substantial question arising under the Constitution of the United States or of this State."   N. C. Gen. Stat. § 7A-30 (Supp. 1985).   As Reynolds explains, the grant of appellees' motion to dismiss the appeal for lack of a substantial federal constitutional question by the North Carolina Supreme Court could be interpreted as a decision on the merits affirming the Court of Appeals' judgment, or it could be viewed as a determination by that court that it lacked jurisdiction over the appeal. See Brief for Appellant 11.   Depending upon how the dismissal is to be characterized, appeal here would properly lie from the Supreme Court or, on the other hand, from the Court of Appeals.[6]

We have resolved that we should decide this jurisdictional question so that practitioners may be certain of their ground. In the absence of positive assurance to the contrary from the North Carolina Supreme Court, we consider that court's dismissal of Reynolds' appeal to be a decision on the merits. Cf. *Michigan* v. *Long,* 463 U. S. 1032, 1037–1044 (1983). With no such contrary assurance in the present record, we

---

[6] Although Reynolds has informed this Court that the Clerk of the North Carolina Supreme Court advised it that a dismissal "for lack of a substantial constitutional question is not regarded by that Court as a decision on the merits," Reynolds observes that there is no reported decision of the Supreme Court of North Carolina that discusses the effect of such a dismissal.   Brief for Appellant 11, n. 8.

conclude that it is the appeal from that court that is the proper one under § 1257.

When confronted with a comparable situation arising from Ohio, this Court ruled that the appeal lies from the Ohio Supreme Court and not from that State's Court of Appeals. See *Matthews* v. *Huwe*, 269 U. S. 262, 265 (1925); *Hetrick* v. *Village of Lindsey*, 265 U. S. 384, 386 (1924). See also *Tumey* v. *Ohio*, 273 U. S. 510, 515 (1927).[7] In *Matthews*, Chief Justice Taft, an Ohioan writing for the Court, explained the appropriateness of the appeal from the Ohio Supreme Court:

> "It is one of those not infrequent cases in which decision of the merits of the case also determines jurisdiction. The petition was dismissed, not because the court was really without jurisdiction, for it could have taken it, but because the question was regarded as frivolous, which is a different thing from finding that the petition was not in character one which the Court could consider." 269 U. S., at 265.

This reasoning is applicable to the present case: there is no question that the North Carolina Supreme Court had jurisdiction to hear Reynolds' appeal, but it determined not to do so in light of its conclusion that the appeal raised no substantial constitutional question.

We therefore regard the appeal in No. 85–1021 (from the Supreme Court of North Carolina) as the proper one, and we dismiss the appeal in No. 85–1022 (from the North Carolina Court of Appeals) for want of jurisdiction.

---

[7] We acknowledge that this Court, in *Doyle* v. *Ohio*, 426 U. S. 610 (1976), allowed certiorari to issue to an Ohio Court of Appeals after the Ohio Supreme Court had dismissed an appeal for lack of a substantial constitutional question. See *id.*, at 616. The "highest court" requirement, however, was not addressed in that case.

We note that treating the North Carolina Supreme Court's summary dismissal as a decision on the merits accords with this Court's view of its own summary dispositions. See *Hicks* v. *Miranda*, 422 U. S. 332, 344 (1975).

## III

On the merits, the crucial issue is whether Congress has exercised its power under the Supremacy Clause to pre-empt ad valorem state taxation of imported goods that are stored in customs-bonded warehouses and that are destined for domestic markets. Under this Clause the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U. S. Const., Art. VI, cl. 2. In determining whether Congress has invoked this pre-emption power, we give primary emphasis to the ascertainment of congressional intent. *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947). This may be manifested in several ways. *Ibid.; Louisiana Public Service Comm'n* v. *FCC*, 476 U. S. 355 (1986). Chief among the indications of an intent to pre-empt is where Congress has legislated so comprehensively that it has left no room for supplementary state legislation. *Rice* v. *Santa Fe Elevator Corp.*, *supra*. Pre-emption may also be found where state legislation would impede the purposes and objectives of Congress. *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941). In undertaking this analysis, however, we must be mindful of the principle that "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142 (1963); *Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Ware*, 414 U. S. 117, 127 (1973) ("So here, we may not overlook the body of law relating to the sensitive interrelationship between statutes adopted by the separate, yet coordinate, federal and state sovereignties"). See *Brown* v. *Hotel Employees*, 468 U. S. 491, 500–501 (1984).

In *Xerox Corp.* v. *County of Harris*, 459 U. S. 145 (1982), this Court recently dealt with the issue of pre-emption of state

taxation on imported goods stored in customs-bonded warehouses. It there examined the narrow question "whether a state may impose nondiscriminatory ad valorem personal property taxes on imported goods stored under bond in a customs warehouse and destined for foreign markets." *Id.*, at 146.[8] At the outset of its pre-emption analysis, the Court in *Xerox*, examined the legislative history of the Warehousing Act of 1846, 9 Stat. 53, the forerunner of the present statutory scheme, in order to uncover the objectives behind the customs-bonded warehouse. The Court observed: "The Act stimulated foreign commerce by allowing goods in transit in foreign commerce to remain in secure storage, duty free, until they resumed their journey in export." 459 U. S., at 150. The Court further noted that making this country a center of world commerce was a desired and conceivable goal in light of our favorable geographic location between the Atlantic and Pacific Oceans that would facilitate the "transshipment of goods." *Id.*, at 150–151. Moreover, for the drafters of the Act, the promotion of foreign commerce went hand in hand with the growth of American shipping and mercantile industries. *Id.*, at 151. The Court concluded: "To these ends, Congress was willing to waive all duty on goods that were reexported from the warehouse, and to defer, for a

---

[8] The facts in *Xerox* reinforce the narrowness of the question examined: the imported goods, Xerox copiers, were plainly designed for sale in Latin America, inasmuch as the operating instructions were in Spanish or Portuguese, the machines, as constructed, would not function on the type of electric current that is standard in the United States, it would have cost $100 to convert each machine for domestic sale, and none of the copiers was ever sold in the United States. 459 U. S., at 147–148. In fact, when Texas authorities began to assess ad valorem personal property taxes on the copiers, Xerox immediately shipped them to a foreign trade zone, from which it continued to send the machines to Latin America, and exhibited no intention to convert them for domestic use. *Id.*, at 148. Accordingly, in *Xerox* the bonded goods were destined to be shipped abroad, unlike Reynolds' tobacco, which is destined for domestic markets.

prescribed period, the duty on goods destined for American consumption." *Ibid.*

The Court, therefore, had to determine whether state taxation of the copiers destined for export would contradict the purpose of promoting foreign commerce and the related goal of aiding certain sectors of American economic life. It limited its pre-emption analysis to whether taxation would impede the congressional objectives. It particularly relied upon its earlier decision in *McGoldrick* v. *Gulf Oil Corp.*, 309 U. S. 414 (1940), where it had found that the federal warehouse scheme pre-empted a New York City sales tax on oil imported under customs bond, refined in a customs-bonded warehouse,[9] and sold as ships' stores for vessels destined for abroad. As the Court in *Xerox* noted, the tax at issue in *McGoldrick* would detract from the benefit American refiners received in their freedom from customs duties on the oil and thus undermined the advantage they gained in the competition with their foreign counterparts. 459 U. S., at 152 (citing *McGoldrick*, 309 U. S., at 429). Applying this reasoning to the case before it, the *Xerox* Court concluded that the waiver of customs duties benefited those merchants who used American ports "as transshipment centers," gave them a competitive advantage over importers using storage facilities in other countries, and thus promoted foreign commerce to the United States. 459 U. S., at 153. Because the waiver so clearly furthered the Act's purposes, any attempt to remove its benefit, such as would occur through state taxation, was incompatible with these goals. The Court thus ruled that state property tax on the copiers was pre-empted.[10]

---

[9] The warehouses with which *McGoldrick* was concerned were of Class 6, see 309 U. S., at 422, defined in the present regulations as those "for the manufacture in bond, solely for exportation, of articles made in whole or in part of imported materials or of materials subject to internal-revenue tax." 19 CFR § 19.1(a)(6) (1986); see also 19 U. S. C. § 1311.

[10] The Court remarked that the factual distinctions between *McGoldrick* and the case before it—namely, that in *McGoldrick* the oil could be sold only as ships' stores and the tax assessed was a sales tax, whereas Xerox

In a summary of its holding, however, this Court rather broadly stated that "state property taxes on goods stored under bond in a customs warehouse are pre-empted by Congress' comprehensive regulation of customs duties." *Id.*, at 154. Reynolds would conclude from that sentence that the holding in *Xerox* precludes state taxation of *any* goods in a customs warehouse, regardless of their destination.[11] As is

could have paid the duty and withdrawn the copiers for domestic sale and was subject to a property tax—were "distinctions without a legal difference." *Xerox,* 459 U. S., at 153. According to Reynolds, this remark reveals that the Court was unconcerned in its analysis with whether the goods stored in customs-bonded warehouses were destined for domestic markets or for export. Taken in context, however, the Court's comment suggests the opposite to us: that Xerox had the option to sell the copiers domestically was not significant, given its clear intention to ship them to Latin America; thus, the copiers were as much destined for transshipment in foreign commerce as was the oil in *McGoldrick.* The difference in the types of taxes in the two cases was of no importance, for imposition of either tax would detract from the benefit accruing to the importer from the waiver of the duty.

That the Court in *Xerox* was concerned solely with goods destined for transshipment in foreign commerce is further demonstrated by the other case upon which it principally relied, *District of Columbia* v. *International Distributing Corp.*, 118 U. S. App. D. C. 71, 331 F. 2d 817 (1964), where the Court of Appeals proscribed a District of Columbia excise tax on the sale of beverages to foreign embassies while the beverages were still in a customs-bonded warehouse. Although this Court, 459 U. S., at 154, cited language from *International Distributing Corp.*, 118 U. S. App. D. C., at 73–74, 331 F. 2d, at 819–820, to the effect that customs-bonded warehouses were "federal enclaves free of state taxation" and goods housed therein were outside the taxing jurisdiction of the District until removed, the case appeared to turn on the fact that international law, recognized by Congress, granted diplomatic personnel the right to import goods duty free and tax free for their own use. *Id.*, at 74, 331 F. 2d, at 820. Arguably, then, the beverages at issue in *International Distributing Corp.* were still in foreign commerce. The Court's additional quotation from *Fabbri* v. *Murphy,* 95 U. S. 191, 197–198 (1877), see 459 U. S., at 154, is not inconsistent with this reading of *McGoldrick* and *International Distributing Corp.* See n. 24, *infra.*

[11] Reynolds also notes that counsel for both Xerox and the state taxing authorities expressed the opinion, in response to questions at oral argu-

clear from what has been said above, however, we accept *Xerox*'s holding and the quoted sentence as limited to the factual situation presented in that case, that is, where the goods are intended for transshipment.

It is difficult, moreover, to believe that the purposes in forming the customs-bonded warehouse scheme identified by the Court in *Xerox* would be disserved by the imposition of ad valorem property taxes on Reynolds' imported tobacco. It makes sense to conclude that state property taxation may discourage an importer whose goods are destined for transshipment in foreign commerce from using American ports and facilities, particularly when the same importer is granted an exemption from customs duties on all goods exported. Similar taxation would hardly deter an importer who, like Reynolds, stores goods in customs-bonded warehouses for up to two years for domestic manufacture and consumption, the storage period arguably being part of the manufacturing process because the tobacco requires aging.[12]  Unlike Xerox,

---

ment in the *Xerox* case in this Court, that the holding would apply either to goods destined for foreign commerce *or* to those earmarked for domestic use.  Reynolds therefore argues here that the Court did intend its broad language to cover both types of goods.  Brief for Appellant 17; Tr. of Oral Arg. 11–12.  Although the questioning at oral argument in *Xerox* suggests that the Court may well have been inquiring into a situation different from the facts before it—not an infrequent occurrence at oral argument—the Court limited the analysis *in its opinion* to goods in transshipment.

[12] Because Reynolds' only manufacturing facility is in Forsyth County, there is no suggestion that Reynolds will discontinue its importation of foreign tobacco if the tax is allowed to stand, and that the tax thus will affect foreign commerce adversely.  In fact, Reynolds has been importing foreign tobacco into North Carolina for approximately 25 years.  See App. 88–89.  Reynolds has been paying the North Carolina ad valorem property tax on its imported tobacco at least since this Court in *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276 (1976), abandoned the "original package" doctrine that had barred property taxes on imported inventory retained in its original package in the hands of the importer.  That doctrine had prevented state taxation on Reynolds' imported tobacco.  See Reply Brief for Appellant 7, n. 9.  It may be noted, however, that Reynolds has filed suit in state court seeking refunds of property taxes it paid on imported

moreover, Reynolds is not completely free of import duties on its goods but simply has them deferred.[13]   Thus, rather than being a charge that detracts from the absolute benefit of the waiver of duties, the state tax here is in addition to the payment of duties and might well be considered as nothing more than an expected cost of doing business.   See *Xerox Corp.* v. *County of Harris,* 459 U. S., at 156 (POWELL, J., dissenting).   Furthermore, while the tax on goods destined for foreign markets would have harmful effects on American industry and workers by discouraging importers from using American ships and ports, to invalidate the North Carolina tax would place domestic tobacco, which is subject to the ad valorem property tax while aging, at a distinct disadvantage to the imported tobacco.   Domestic producers and local taxpayers would thus "subsidize" the growers of imported tobacco.[14]   See *In re R. J. Reynolds,* 73 N. C. App., at 484,

---

tobacco for 1980, 1981, and 1982, has paid under protest the taxes for 1984 and 1985, and has claimed—and been denied—an exemption for 1986. See Brief for Appellees 7, n. 8.

[13] The cost of the imported tobacco for which Reynolds sought exemption is $519,059,527.   App. to Juris. Statement 28a–29a.   The customs duties on this tobacco amount to approximately $42–48 million.   *Id.,* at 32a.   The tax at issue is about $5 million annually.   Brief for Appellees 31, n. 34.

[14] North Carolina does grant domestic tobacco (and other "farm products") an exemption from taxation for the year following the one in which the product is grown if it is in "an unmanufactured state" and "owned by the original producer."   2D N. C. Gen. Stat. § 105–275(4) (1985).   Although this tends to equalize competition between imported and domestic tobacco, it is not clear from the record that Reynolds' domestic tobacco is eligible for the benefit of § 105–275(4).   Even if all of Reynolds' tobacco received the benefit of that provision, it would still not be on an equal competitive footing with imported tobacco, which would be exempt from property taxes for up to five years as long as it is stored in customs-bonded warehouses.   See 19 U. S. C. § 1557(a).

There is no indication in the legislative history of the Warehousing Act that one of the goals of the customs-bonded warehouse system was to benefit imported goods in their competition with domestic goods.   In fact, when the bill was debated in the Congress, legislators expressed concern

326 S. E. 2d, at 917 ("Also, since this imported tobacco receives the same local governmental services, such as police and fire protection, as domestic tobacco, local taxpayers

---

that the deferral of duties would benefit the foreign merchant at his domestic counterpart's expense:

"The foreigner could warehouse his goods, safely and cheaply, for three years, without being compelled to pay the duties. He can sell the goods out as he finds customers; and by continuing the practice of invoicing his goods at a cheaper rate than the American merchant can, he will always place himself in a more advantageous position, and the effect would be to drive the latter out of business." Cong. Globe, 29th Cong., 1st Sess., 1042 (1846) (remarks of Sen. Huntington).

See also Cong. Globe, 29th Cong., 1st Sess., App. 1166 (1846) (remarks of Rep. Smith).

In response to these criticisms, Senator Dix, one of the sponsors of the bill in the Senate, explained that deferral of duties would not give foreign importers and goods such a benefit:

"Whether goods are stored in the countries where they are produced, or in our own cities, is of no consequence so far as the question of competition with our domestic products is concerned, unless it can be shown that in the latter case (storing in our own cities) they will be brought into the domestic market at a cost materially less. This, it is believed, cannot be readily shown. Whether stored at home or abroad, the expense of bringing merchandise into the domestic market must be nearly the same. In either case it has the same processes to perform. It must be transported from the factories or workshops where it is produced, to the sea; it must be shipped, carried across the ocean, brought into our ports, and before it can enter into the domestic market to be sold, the impost or duty must be paid. The charges and exactions are the same in both cases. If it is placed in store here and allowed to remain for a limited period without paying duty, it is in no better condition, so far as cost is concerned, than it would have been if it had been kept in store in the country where it was produced, unless storage here is cheaper, and this is questionable." *Id.*, at 795.

Senator Dix noted that some benefit might accrue to importers of foreign goods because of the deferral of duties (*i. e.*, interest on the amount for the duties during the deferral period), but he considered that to be immaterial and, in any event, more than offset by the promotion of foreign commerce. *Id.*, at 795–796. Thus, rather than believing that the Act improved the competitive position of foreign goods and their importers, Senator Dix disavowed this purpose and discounted any such effect.

would be forced to provide a subsidy in excess of a million dollars to Reynolds"). Permitting imposition of a tax thus leads to equal treatment for imported and domestic tobacco.

One of the Warehousing Act's major goals, manifested in its scheme of deferral and waiver of duties, was to promote the importer's flexibility with respect to his goods. Under the system in place prior to the Warehousing Act, an importer was required to pay the duties in cash when the goods were unloaded from the vessel; if no duties were paid, interest on them would immediately accrue and would have to be satisfied, or the customs officials would sell the goods for the charges. See Cong. Globe, 29th Cong., 1st Sess., App. 790 (1846) (remarks of Sen. Dix).[15] What this meant for the merchant who did not have a ready source of funds was that he would be forced to part with a portion of his goods, often in an unfavorable market, in order to raise money to pay the duties. Id., at 792; see also H. R. Rep. No. 411, 29th Cong., 1st Sess., 1–3 (1846). Moreover, an importer who was unsure about the ultimate destination of the goods would be penalized by keeping them in warehouses in this country, for he would lose the benefit of the use of the money that had been paid for the customs duties. See Cong. Globe, 29th Cong., 1st Sess., App. 792 (1846) (remarks of Sen. Dix). By permitting an importer to defer duties for a set period of time and to have a waiver of duties on reexported goods, the Warehousing Act enabled the importer, without any threat of financial loss, to place his goods in domestic markets or to return them to foreign commerce and, by this flexibility, encouraged importers to use American facilities.[16]

---

[15] The pre-Warehousing Act system, which required payment of a cash duty as high as 40% of the value of the goods, see H. R. Rep. No. 411, 29th Cong., 1st Sess., 1 (1846), was itself a response to an earlier system that had allowed importers to defer payment of customs duties for as long as nine months. See Cong. Globe, 29th Cong., 1st Sess., App. 790 (1846) (remarks of Sen. Dix).

[16] Although there were efforts in both the House and the Senate to require a merchant to designate at the outset which portion of his goods was

It is difficult to discern how imposition of an ad valorem tax will affect an importer's flexibility in a situation where, as here, goods are destined for domestic markets. Given that the tobacco is aging in the customs-bonded warehouses in preparation for domestic manufacture and sale in this country, Reynolds does not occupy the position of an importer looking for the best market, domestic or foreign, in which to place the stored goods.[17] In any event, Reynolds clearly benefits from the flexibility created by the Warehousing Act. By being allowed to defer customs duties on the imported tobacco for up to five years, Reynolds is able to decide how much imported tobacco to use in its manufacturing process at any given time, depending upon the demand for its products in the domestic market.

Nor is there any suggestion that taxation here would conflict with the central purpose behind the customs-bonded warehouses: to ensure that federal customs duties are collected. See *Xerox Corp.* v. *County of Harris*, 459 U. S., at 155 (POWELL, J., dissenting). Not only is the present statutory and regulatory framework sufficient to permit customs officials to monitor the entrance and removal of goods from warehouses and thus to guarantee collection of federal revenue, but Reynolds does not explain how, on the facts of this case, imposition of the North Carolina tax will prevent cus-

---

intended for reexport or for domestic use, such attempts were rejected. See Journal of the Senate, 29th Cong., 1st Sess., 406–407 (1846); Cong. Globe, 29th Cong., 1st Sess., 1178 (1846). Rejection of such amendments suggests that Congress intended to give maximum flexibility to the importer who was unsure of the ultimate destination of the goods.

[17] We make no determination with respect to warehoused goods that are not, as are those here, destined for the domestic market. We leave for another day such questions as what degree of probability of shipment to foreign markets must be shown to invoke the tax exemption, and whether, with regard to goods for which that showing has been made, state taxes may nevertheless be annually assessed but not collected until release into the domestic market occurs.

toms officials from receiving the duties.[18]    See n. 3, *supra.*
And the present statutes and regulations that guide this
monitoring and the warehouse proprietor's own conduct with
respect to the imported goods are not so comprehensive as to
leave no room for North Carolina's assessment of ad valorem
taxes.    See *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S., at
230; *Louisiana Public Service Comm'n* v. *FCC*, 476 U. S.,
at 370.    Although the regulations are not themselves control-
ling on the pre-emption issue, see *Xerox Corp.* v. *County of
Harris*, 459 U. S., at 152, n. 8, where, as in this case, Con-
gress has entrusted an agency with the task of promulgating
regulations to carry out the purposes of a statute, see 19
U. S. C. § 1556, as part of the pre-emption analysis we must
consider whether the regulations evidence a desire to occupy
a field completely.    See *Fidelity Federal Savings & Loan
Assn.* v. *De la Cuesta*, 458 U. S. 141, 153–154 (1982).    Pre-
emption should not be inferred, however, simply because the
agency's regulations are comprehensive.    See *Hillsborough
County* v. *Automated Medical Laboratories, Inc.*, 471 U. S.
707, 716–718 (1985).    In this case, the current regulations,
while detailed, appear to contemplate some concurrent state
regulation and, arguably, even state taxation.[19]

---

[18] Although Reynolds suggests that practical problems may arise for an
importer whose goods are subject to state taxation and who must decide
which goods to designate for domestic use, Brief for Appellant 25, this case
presents no such practical difficulties.    Here, all the goods are destined for
domestic manufacture.    As has been noted, Reynolds has paid the tax in
question for several years without, apparently, experiencing any serious
difficulty.    See n. 12, *supra.*

[19] For example, an applicant for the proprietorship of a bonded ware-
house must estimate the "maximum duties and taxes" that will be due on
goods stored therein at any one time.    19 CFR § 19.2(a) (1986).    Under
this regulation, state taxation is entirely consistent with the supervisory
control over stored goods exercised by customs officers.    Pursuant to
§ 19.7, moreover, warehoused goods shall be "liable for the expenses of
labor and storage . . . and for all other expenses accruing upon the goods."
Expenses might be read here to include state ad valorem property taxes.
Under § 19.12(b)(3), to maintain the security of the merchandise a ware-

Finally, we agree with the North Carolina Court of Appeals that this case presents a factual situation similar to that in *American Smelting* and that the California Court of Appeal's reasoned decision is therefore pertinent.[20] The Court of Appeal considered whether metal-bearing ores and concentrates to be treated in a customs-bonded smelting and refining warehouse,[21] some to be reexported and others to be used in domestic markets, were subject to a local property tax. Relying upon *McGoldrick* v. *Gulf Oil Corp.*, 309 U. S. 414 (1940), the Court of Appeal concluded that the refined materials destined to reenter the exportation stream were exempt from local taxation. 271 Cal. App. 2d, at 481, 77 Cal. Rptr., at 601. With respect to similar materials intended for domestic consumption, however, the court concluded that "neither the laws, nor the regulations, nor the precedents . . . show a congressional intent to interfere with the right of the state to tax goods which have been imported for, and

house proprietor is to comply with Treasury Regulations, but in the event of a conflict between them and "any local, state or Federal standard," the latter shall control. This suggests that dual federal and state regulation of customs-bonded warehouses is not only possible but contemplated under the regulations.

[20] Reynolds contends that in light of the decision in *Xerox* the summary dismissal in *American Smelting* is entitled to no precedential value. Reply Brief for Appellant 8. Given the limited focus in *Xerox*, we do not think that the decision in that case is at odds with *American Smelting* or affects the precedential weight, albeit limited, of the summary dismissal for want of a substantial federal question. See *American Smelting & Refining Co.* v. *County of Contra Costa*, 396 U. S. 273 (1970); *Hicks* v. *Miranda*, 422 U. S., at 344.

[21] It is irrelevant that the warehouses in *American Smelting* were Class 7 customs-bonded warehouses designed "for smelting and refining imported metal-bearing materials for exportation or domestic consumption," 19 CFR § 19.1(7) (1986); see also 19 U. S. C. § 1312(a), and different from the Class 2 and Class 8 warehouses at issue here. We note that *McGoldrick*, which the Court considered as precedent for its decision in *Xerox*, concerned Class 6 warehouses, designed for the manufacture of articles destined solely for exportation and not of the type used by Xerox. See n. 9, *supra*.

have been appropriated to, processing for domestic consumption." *Ibid.* The Court of Appeal could see no reason why state taxation on such goods would interfere with the primary benefit to be given the importer—deferral of the duties, and the Federal Government's concern with collecting its customs duties. It thus concluded that there was no reason why this taxation should depend upon *when* the goods were withdrawn from the warehouses. *Id.*, at 469–470, 77 Cal. Rptr., at 593–594. A customs-bonded warehouse was not to become an "enclave of foreign commerce," *id.*, at 470, 77 Cal. Rptr., at 594, nor was it to give the operator of the smelter a "bounty" that would enable it to prevail in its competition over "domestic smelters refining domestic ores." *Id.*, at 474, 77 Cal. Rptr., at 596–597. So also here, regardless of the imposition of the North Carolina ad valorem tax, Reynolds will be able to defer payment of the customs duties; the Federal Government will receive its customs revenue; and domestic producers of tobacco will not suffer in their competition with the imported tobacco.[22]

---

[22] Reynolds also argues that the legislative history of the Trade and Tariff Act of 1984, Pub. L. 98–573, 98 Stat. 2948, which, among other things, amended the Foreign Trade Zones Act, ch. 590, 48 Stat. 998, codified, as amended, at 19 U. S. C. §§ 81a–81u (1982 ed. and Supp. III), shows that Congress understood the *Xerox* holding to be broad, *i. e.*, as prohibiting local taxation on *all* goods stored in customs warehouses. That legislation provides a statutory exemption from state and local property taxes for goods held in a foreign trade zone. While foreign trade zones are more difficult to establish than customs-bonded warehouses, they do permit a wider range of operations. See 19 U. S. C. § 81c (1982 ed., Supp. III); 1 R. Sturm, Customs Law & Administration § 18.1, pp. 45–52 (1986); Note, 17 Geo. Wash. J. Int'l L. & Econ. 555, 564–565 (1983). Reynolds buttresses its argument with statements in the legislative history to the effect that, by passing this amendment, Congress was bringing the prohibition of taxation of imported goods in foreign trade zones in line with a similar prohibition in customs-bonded warehouses. See, *e. g.*, 129 Cong. Rec. 14501 (1983) (statement of Sen. Tower); H. R. Rep. No. 98–267, p. 35 (1983); S. Rep. No. 98–308, p. 36 (1983). Just as in the case of imported goods in customs-bonded warehouses, those stored in foreign

We therefore hold that, consistent with the Supremacy Clause, a State may impose a nondiscriminatory ad valorem property tax on imported goods stored in a customs-bonded warehouse and destined for domestic manufacture and sale.

## IV

We turn to Reynolds' remaining constitutional arguments that the North Carolina ad valorem property tax violates the Import-Export [23] and Due Process Clauses. The Court has stated that its decision in *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276 (1976), "adopted a fundamentally different ap-

---

trade zones are subject to import duties only when they are withdrawn for domestic consumption.    See 19 U. S. C. § 81c (1982 ed., Supp. III).

Such statements given in the context of a different piece of legislation dealing with a different part of the customs scheme are not persuasive as to congressional purpose with respect to customs-bonded warehouses.    See *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 117–118, and n. 13 (1980) (congressional statements explaining intent of previous legislation are entitled to less weight than the statute's language and its legislative history before enactment).    Moreover, the Trade and Tariff Act of 1984 had a narrow focus: the legislators from Texas sought to pre-empt state taxation of goods in foreign trade zones because Texas, alone among the States, permitted this taxation and thus businesses were discouraged from locating such zones in that State.    See 129 Cong. Rec. 14501 (1983) (remarks of Sen. Bentsen) ("The Bentsen-Tower bill addresses a very narrow problem dealing with foreign trade zones in the State of Texas").    Foreign trade zones are valued because they actually promote domestic industry and create jobs.    *Ibid.*    Given that the taxation of goods in foreign trade zones could arguably harm domestic industry, while exemption from taxation of the imported goods in the present case would serve to discriminate against domestic producers, there appears to be a sufficient justification for the difference in state taxation with respect to these customs entities.    There is no evidence that Reynolds also uses foreign trade zones for the purpose of aging its imported tobacco. Cf. *Xerox Corp.* v. *County of Harris*, 459 U. S., at 148 (when threatened with local taxes, Xerox immediately shipped its copiers to a foreign trade zone).

[23] "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except . . . ."    U. S. Const., Art. I, § 10, cl. 2.

proach to cases claiming the protection of the Import-Export Clause." *Limbach* v. *Hooven & Allison Co.*, 466 U. S. 353, 359 (1984); see also *Washington Revenue Dept.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734, 752–754 (1978). We explained this approach, and its distinction from the earlier analysis, in *Limbach:*

> "To repeat: we think it clear that this Court in *Michelin* specifically abandoned the concept that the Import-Export Clause constituted a broad prohibition against all forms of state taxation that fell on imports. *Michelin* changed the focus of Import-Export Clause cases from the nature of the goods as imports to the nature of the tax at issue. The new focus is not on whether the goods have lost their status as imports but is, instead, on whether the tax sought to be imposed is an 'Impost or Duty.'" 466 U. S., at 360.

In *Michelin*, we concluded that a Georgia nondiscriminatory ad valorem property tax, which had been assessed upon imported tires and tubes stored in a warehouse, was not the kind of tax prohibited by the Import-Export Clause, inasmuch as it did not offend the policies behind the Clause: concern that an impost or duty might interfere with the Federal Government's regulation of commercial relations with foreign governments; fear that on account of such state taxation the Federal Government would lose an important source of revenue; and a desire to maintain harmony among the States, which would be disturbed if seaboard States could tax goods "merely flowing through their ports" to other States not so favorably situated. 423 U. S., at 285–286.

The nondiscriminatory ad valorem property tax at issue here seems indistinguishable from the tax in *Michelin* in terms of these policies. The North Carolina tax does not interfere with the Federal Government's regulation of foreign commerce, for, as we have seen, it falls on imported and domestic goods alike and does not single out imported goods for unfavorable treatment. See *id.*, at 286. Having concluded

that the tax does not impede the collection of customs duties, it follows that it neither impairs an important source of revenue for the Federal Government nor replaces the federal duty with one of its own. *Ibid.* Rather, the property tax is nothing more than a means "by which a State apportions the cost of such services as police and fire protection among the beneficiaries according to their respective wealth." *Id.*, at 287. If imposition of the tax happens to have the "incidental effect," *ibid.*, of discouraging some importation of foreign goods, prohibiting this result is not a function of the Import-Export Clause. Finally, in light of the services provided in exchange for this tax, it hardly constitutes the kind of exaction by the seaboard States on goods destined for inland States that the Framers sought to prevent by the Clause. *Id.*, at 288. A failure to assess the tax would shift the tax burden from Reynolds and the ultimate consumers of its tobacco products to the local taxpayers of North Carolina—a result completely at odds with *Michelin*. See *id.*, at 289. Accordingly, we conclude that the application of the tax to Reynolds' imported tobacco does not violate the Import-Export Clause.

This Court has observed that in *Michelin* it limited its holding to the imported goods "'no longer in transit.'" *Washington Revenue Dept.*, 435 U. S., at 755 (quoting *Michelin*, 423 U. S., at 302). Reynolds contends that, because goods stored in customs-bonded warehouses are by definition "in transit," this case does not fall within the scope of *Michelin*'s holding.[24] This reasoning, however, is unpersuasive.

---

[24] For this argument, Reynolds particularly relies upon the *Xerox* Court's favorable citation of *International Distributing Corp.* to the effect that the goods in customs warehouses were outside the District of Columbia's jurisdiction, 459 U. S., at 154 (citing 118 U. S. App. D. C., at 73–74, 331 F. 2d, at 819–820), and the Court's remark that "'Congress did not regard the importation as complete while the goods remained in the custody of the proper officers of customs,'" *ibid.* (quoting *Fabbri* v. *Murphy*, 95 U. S., at 197–198). In our view, such reliance is misplaced. The Court in *Xerox* declined to reach the Import-Export Clause issue and was con-

The imported tobacco here, we repeat, has nothing transitory about it: it has reached its State—indeed, its county—of destination and only the payment of the customs duty, after the appropriate aging, separates it from entrance into the domestic market. More importantly, an automatic "in transit" status for goods stored in customs-bonded warehouses can be inferred only if Congress intended to confer it upon *all* goods stored in customs-bonded warehouses. See *Xerox Corp.* v. *County of Harris*, 459 U. S., at 157 (POWELL, J., dissenting). As we have seen, state taxation of such goods destined for domestic markets is contrary to none of the purposes for which Congress established the customs-bonded warehouse scheme. It strains reason to think that, although Congress could have directly pre-empted state taxation in this situation by declaring it to be in conflict with the purposes of customs-bonded warehouses or by directing the United States Customs Service to issue regulations governing taxation of stored goods, Congress decided to achieve the same effect in a more roundabout fashion by giving the goods the talismanic "in transit" status.

---

cerned only with the possible pre-emption of state taxes in the limited context of goods destined to reenter the export stream. Thus, the citations are consistent with *Xerox*'s restricted conclusion that such goods should not be subject to ad valorem property taxes.

By themselves these cases do not give any significant weight to Reynolds' present contention. Although there is language in *International Distributing Corp.* concerning the locality's jurisdiction over goods in customs-bonded warehouses, as we observed above, see n. 10, *supra,* the decision turned on reciprocity in permitting diplomatic personnel to bring in goods duty and tax free and did not deal with the Import-Export Clause issue. Reynolds' reliance on *Fabbri* is not helpful either, because that case involved a dispute over whether an importer would be required to pay interest on the customs duty, in addition to the duty itself, when imported goods were withdrawn over a year after they had been stored. 95 U. S., at 193. Once again, no Import-Export Clause issue was raised in the case, and the remark from *Fabbri* specifically addresses the appropriateness of the interest charge: that interest was to be paid so long as the goods were in customs officials' custody. *Id.*, at 197–198.

We also find no merit in Reynolds' due process claim. As noted by the North Carolina Court of Appeals, it is well settled that a state tax comports with the Due Process Clause if "the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state." *Wisconsin* v. *J. C. Penney Co.*, 311 U. S., at 444; see 1 R. Rotunda, J. Nowak, & J. Young, Treatise on Constitutional Law § 13.2, p. 669 (1986). In light of the police, fire, and other services provided to Reynolds' imported tobacco by the North Carolina counties and cities, such a "fiscal relation" clearly exists in this case. Although Reynolds contends that goods located in customs-bonded warehouses are outside the taxing jurisdiction of the State because of their "in transit" status, for the reasons given above this argument no more succeeds in the due process context than it does when addressed to the Import-Export Clause analysis.

In No. 85–1021, the judgment of the Supreme Court of North Carolina is affirmed. The appeal in No. 85–1022 is dismissed for want of jurisdiction.

*It is so ordered.*