836 F.2d 485
 56 USLW 2374, 34 Cont.Cas.Fed. (CCH) 75,419
 INTEGRITY MANAGEMENT INTERNATIONAL, INC., a California
Corporation, Plaintiff- Appellant,
v.
TOMBS & SONS, INC., a Kansas Corporation, and Leroy C.
Tombs, Defendants- Appellees.
 No. 85-2247.
 United States Court of Appeals,
Tenth Circuit.
 Dec. 30, 1987.
 
 Gary D. McCallister of Davis, Wright, Unrein, Hummer & McCallister, Topeka, Kan., for plaintiff-appellant.
 Timothy J. Arehart of McDonald, Dykes, Christlieb, Leitner & Preston, Overland Park, Kan., for defendants-appellees.
 Before McKAY, SEYMOUR and MOORE, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 Tombs & Sons, Inc. (Tombs) was the low bidder on a small business set-aside contract. Integrity Management International, Inc. (IMI), the second low bidder, filed a protest claiming that Tombs was not a small business within the meaning of the Small Business Act and its regulations. After the Small Business Administration determined that Tombs did not meet its small business standards, IMI brought this diversity suit against Tombs, claiming unjust enrichment, intentional interference with its economic advantage in securing contract rights, and fraud and misrepresentation. The district court held that state common law actions to enforce the Small Business Act are preempted by federal law, and ordered judgment to be entered in favor of Tombs. Integrity Management Int'l, Inc. v. Tombs & Sons, Inc., 614 F.Supp. 243, 246-47 (D.Kan.1985). We agree with the other circuits that have considered the matter that state common law actions are not preempted here. We therefore reverse.
 
 I.
 
 2
 The Small Business Administration (SBA) administers a number of programs under the Small Business Act, 15 U.S.C. Secs. 631-650 (1982 & West Supp.1987). One of these, the small business set-aside program, is designed to ensure that small businesses receive a fair proportion of the federal government's procurement contracts. The businesses involved self-certify that they are in fact small businesses; the SBA makes size determinations only after a protest is made by a contracting officer or an interested party. 13 C.F.R. Sec. 121.8(a) (1987).
 
 
 3
 In February 1982, the United States Military Academy at West Point solicited bids for a one-year 100% set-aside food service contract with four one-year options to renew. Thirteen bids were submitted. Tombs was the low bidder, IMI the second low bidder.[1] Aware of another food service contract held by Tombs, IMI believed that Tombs exceeded the size limits imposed by SBA regulations and was therefore ineligible to bid on the West Point contract. IMI filed a timely protest with the procurement office at West Point.
 
 
 4
 Tombs' original financial statements and income tax returns for the years 1979-1981 showed amounts that, when averaged, exceeded the $5.5 million size-limitation standard then used by the SBA.[2] Nevertheless, Tombs certified itself as a small business. After IMI filed its protest, Tombs revised its statements, thereby reducing the amounts shown to a level that complied with the SBA standard. Neither the original nor the revised statement included receipts from an affiliated corporation, Global Supply Company, that sold supplies to Tombs on the West Point and other projects. The SBA's Form 355 that Tombs submitted in response to IMI's protest showed only the revised amounts and did not include the receipts from Global. Based only on the information submitted, the SBA regional office determined that Tombs was a small business. The West Point contracting officer then awarded the contract to Tombs.
 
 
 5
 IMI filed an appeal of the regional office's determination with the SBA Size Appeals Board. After reviewing Tombs' original financial statements, its income tax returns, receipts from Global, and the revised financial statement submitted to the regional office, the Board determined that Tombs was a large business. IMI then filed this action, asserting that Tombs had misrepresented itself as a small business in order to secure the contract award.
 
 II.
 
 6
 As we discuss below, two considerations guide us on the issue of preemption. First, the question to be addressed is that of Congress' intent. To ascertain that intent we look not only to the statute and its legislative history, but also, where those are silent or unclear, to the agency charged with carrying out the statute's mandate. The extent of the authority given to the agency determines whether it has the power to preempt state law, and the agency's policies, practices, and regulations are evidence of whether the agency has in fact done so.
 
 
 7
 Second, the focus of our inquiry is not federal procurement, or even small business set-aside contracts, but the remedy for violation of the Small Business Act and its regulations. It is entirely possible for the substantive area of the law to be an area of exclusive federal concern, and nevertheless for state common law remedies to apply. See Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 257-58, 104 S.Ct. 615, 626, 78 L.Ed.2d 443 (1984) (state tort actions not preempted by exclusive federal regulation of nuclear safety). Thus, in this case, the establishment of size standards under the Small Business Act and the determination of whether a business meets those standards is an area of exclusively federal law. The remedies available to those harmed by businesses that the SBA has found to violate those standards, however, need not necessarily be exclusively federal.
 
 
 8
 State law may be preempted by an express congressional statement, by federal occupation of the field, or by direct conflict with federal law. In Louisiana Pub. Serv. Comm'n v. Federal Communications Comm'n, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), the Supreme Court recently stated that preemption occurs when any of six conditions exist:
 
 
 9
 " when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress."
 
 
 10
 Id. at 1898 (citations omitted). On the question of civil remedies for violations of the Small Business Act by bidders, Congress has preserved an immaculate silence.[3] No provision addresses the question, and the legislative history is silent as well.[4] The first method of preemption is thus not in issue. Indeed, because we are concerned only with state remedies for violations of state causes of action between bidders on set-aside contracts, only the last of these methods is arguably applicable.[5]
 
 A. Statutory Preemption
 
 11
 The objective of the Small Business Act is clearly stated in section 631 of the Act:
 
 
 12
 "It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases ... and services for the Government ... be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the over-all economy of the Nation."
 
 
 13
 15 U.S.C. Sec. 631(a) (1982).
 
 
 14
 Tombs argues, and the district court agreed, that Congress' "second primary goal" in enacting the Small Business Act was "to assure that government contracts were performed in a timely and competent manner." Integrity Management, 614 F.Supp. at 245; Brief of Defendant-Appellee at 7. Although no citation to the Act or its legislative history is given to support this asserted goal, we recognize that Congress does, of course, have an interest in timely and competent performance of those contracts. However, aiding small businesses by limiting the number of eligible bidders for those contracts necessarily reduces this efficiency to some extent. We cannot infer from the mere existence of an efficiency goal how much efficiency Congress was willing to sacrifice to help small businesses. While Congress must have intended to strike a balance, state remedies for violation of the substantive provisions of the Small Business Act need not necessarily conflict with Congress' overall goals.
 
 
 15
 Indeed, there are plausible and persuasive arguments both for and against preemption in this case. Arguments for preemption include: 1) the burden on successful bidders faced with lawsuits and the consequent disincentive to bid for and accept set-aside awards, 2) the incentive provided by a state law remedy for unsuccessful bidders to use that remedy, which holds out the potential for gaining contract profits without contract performance, instead of the federal regulatory scheme for protesting, and 3) the fact that a state law remedy, if any, would depend entirely on the existence of and standards set in the Small Business Act and would operate in an area--federal procurement--that can be of no interest to the states.
 
 
 16
 Arguments against preemption include: 1) the lack of harm to the government from state law remedies between bidders, because the contract, once awarded, is treated as presumptively valid,[6] 2) the incentive provided for unqualified large businesses not to bid on set-aside contracts, and most significantly, 3) the strong presumption against preemption of state law, particularly in those areas of law traditionally regulated by states, such as actions for fraud and unjust enrichment. We discuss these briefly.
 
 1. Burdens on Bidders
 
 17
 The argument that a private cause of action to remedy violations of the Small Business Act would unduly burden successful bidders was first made in Savini Constr. Co. v. Crooks Bros. Constr. Co., 540 F.2d 1355 (9th Cir.1974), in which the Ninth Circuit concluded that there was no implied federal right of action to enforce the Small Business Act. The court stated:"Had [the successful bidder] known that, depending on the post-award outcome of the size appeal, it would be subject to suit for its profits, it might well have declined to accept the award. Or, having accepted, it might have refused to continue work on the contract following the Size Appeals Board determination that it was originally ineligible to bid. Finally, although [the successful bidder] might have continued to execute the contract, serious problems of quality and speed of work could have arisen given the possible deprivation of profits at the conclusion of the project."
 
 
 18
 Id. at 1359. Tombs repeats and expands on these propositions. Brief of Defendant-Appellee at 8-11.
 
 
 19
 This argument has been accorded less weight in the context of determining whether a state right of action to enforce the Small Business Act may exist. See Icono v. Jensen Constr. Co., 622 F.2d 1291, 1299 (8th Cir.1980) ("mere threat of legal action, without more, is not sufficient ... to discourage either the submission of bids or the acceptance of a contract award"); accord Tectonics, Inc. v. Castle Constr. Co., 753 F.2d 957, 963 (11th Cir.), cert. denied, 474 U.S. 848, 106 S.Ct. 143, 88 L.Ed.2d 118 (1985). We too find the argument less than compelling in this context. In the years since Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the courts have been "extremely reluctant to imply a [federal] cause of action absent ... specificity on the part of the Legislative Branch." Cannon v. University of Chicago, 441 U.S. 677, 718, 99 S.Ct. 1946, 1968-69, 60 L.Ed.2d 560 (1979) (Rehnquist, J., concurring). The reluctance to imply private actions is particularly strong when a statute is completely silent. Because implied federal causes of action are disfavored, the argument found compelling in Savini must be seen in its context. Conversely, there is great reluctance to assume that Congress did intend to preempt state law with respect to a particular area when Congress was silent regarding the matter of preemption. See Part 4. While the Savini argument has some merit, in this case it must be balanced against the reluctance to find that state law has been preempted.
 
 
 20
 Moreover, to whatever extent the availability of a state common law remedy produces negative effects on successful qualified bidders, these effects are at least partially offset by the positive effects of such a remedy on other bidders. While we recognize that the possibility of being sued is one that no business views with enthusiasm, we believe that the principal effect of such a possibility is that bidders will take greater care to ensure that they meet the SBA's size standards. Finally, a state cause of action to enforce the Small Business Act would discourage businesses that are not small, like Tombs, from improperly attempting to secure set-aside contracts, see Tectonics, 753 F.2d at 963 n. 5.
 
 2. Incentives
 
 21
 Absent a state right of action, an unsuccessful bidder has at least two avenues of redress. It can request a size determination from the SBA, see 13 C.F.R. Secs. 121.8-121.9 (1987), or it can bring suit under the Administrative Procedure Act, 5 U.S.C. Sec. 702 (1982). See Cincinnati Elec. Corp. v. Kleppe, 509 F.2d 1080, 1084-86 (6th Cir.1975).[7] The district court suggested that allowing a state right of action would provide a perverse incentive: an unsuccessful bidder would prefer to wait until the contract had been awarded and performed, and then sue on state law grounds rather than using the SBA's procedures. Integrity Management, 614 F.Supp. at 246. By suing in state court, the bidder may be awarded profits it has not earned, while if it only follows administrative procedures, the most the bidder can hope for is that the contract has not already been awarded and will be awarded to it. See id. at 246; see also Northland Equities, Inc. v. Gateway Center Corp., 441 F.Supp. 259, 263 (E.D.Pa.1977) (allowing an unsuccessful [non set-aside] bidder to sue after the award is made "would provide an irresistible disincentive to his coming forth at an earlier time" and "wreak havok on procurement").
 
 
 22
 We do not think the contrast is so stark. Unsuccessful bidders have been unsuccessful in court where they did not have a ruling from the SBA that the successful bidder was too large. See Ferguson-Williams, Inc. v. Bamsi, Inc., 782 F.2d 940 (11th Cir.1986) (affirming summary judgment for defendant because SBA had not found it to be a large business and court must give deference to SBA's determination); cf. Tectonics, Inc. v. Castle Constr. Co., 496 So.2d 704 (Ala.1986) (refusing to confer state cause of action on unsuccessful bidder when federal law conclusively presumed the low bidder to be small).[8] An unsuccessful bidder will thus have a strong incentive to use the SBA's procedures, and to sue only when its case is supported by the SBA's determination.
 
 
 23
 Moreover, bidders have an incentive to obtain the contract itself rather than merely seeking its profits. Because procurement officers may consider factors other than the lowness of the bids offered, see 48 C.F.R. Secs. 13.104, 14.407-2, 15-605(b) (1987), familiarity with a previous awardee would presumably work to that firm's benefit when procurement officers make future decisions. Bidders thus have good reason to challenge the size of the low bidder before the contract is awarded.
 
 3. Area of Federal Concern
 
 24
 Tombs argues persuasively that the states' interest in adjudicating actions between bidders on federal set-aside contracts is minimal.
 
 
 25
 "The Small Business Act applies to and effects [sic] only those involved in federal procurement. It reaches, not the public generally, but those having very specific [relationships] with the federal government itself. The law and the regulations promulgated under it regulate the relationship between the federal government and others, not between citizens themselves....
 
 
 26
 "...
 
 
 27
 "It seems so painfully obvious that the body of federal law relating to procurements by the federal government is so far removed from the interests and power of the states, that actions such as this may even be beyond the jurisdiction of state courts. After all, the SBA and federal procurement statutes constitute a body of law in and of itself, which creates its own remedies for unsuccessful bidders...."
 
 
 28
 Brief of Defendant-Appellee at 14, 19. Indeed, the highest court of one state has concluded that there is "absolutely no logic in interpreting the Small Business Act to allow a state cause of action." Tectonics, 496 So.2d at 706.
 
 
 29
 Furthermore, IMI's state law cause of action, if any, exists only because a federal statute has directed that certain contracts be set aside for entities determined by federal regulations, and in spite of normal privity of contract rules. See Icono, 622 F.2d at 1295-96. Tombs argues that the effect of allowing state common law actions is that "fifty states [will] become involved in interpreting and applying the federal law and SBA regulations" and that "the effective uniform administration of the small business set-aside program will be lost." Brief of Defendant-Appellee at 14. The dissent agrees with these assertions.
 
 
 30
 Small business set-aside contracts are not merely one kind of government procurement contracts, however. They do more than provide the government with needed supplies and services; they embody a national policy of promoting free enterprise that the states have an interest in promoting as well. Moreover, unjust enrichment, intentional interference with securing a contract, and fraud are torts for which states have an interest in providing a remedy regardless of the means by which they are accomplished. Whether the kinds of misrepresentations Tombs has made in fact fall within the scope of a particular state's contract and fraud actions is not for this court to decide in the first instance. Nor do we believe that such actions would create the chaos Tombs predicts. IMI does not propose that the court below make its own determination of small business status. The federal Size Appeals Board has ruled that Tombs is not a small business. IMI merely urges the trial court to adopt this federal determination of small business status under the federal regulations as evidence of state law torts. See Tectonics, 496 So.2d at 706-08 (Adams, J., dissenting). It is precisely because federal regulations and determinations will provide the standard by which to measure culpability that "the effective uniform administration" of the set-aside program will not be disturbed.
 
 4. Presumption Against Preemption
 
 31
 The reasoning above inclines us to hold that there is no preemption of state common law remedies in this case. A surer basis for that holding, however, is the near presumption against preemption of traditional state law. See Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981) ("Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law."); Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) ("Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons--either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' "); Los Alamos School Bd. v. Wugalter, 557 F.2d 709, 714 (10th Cir.) ("It will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intent to do so."), cert. denied, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 455 (1977). The SBA's policies, practices, and regulations, which we address below, make an even stronger case for this presumption.
 
 B. Regulatory Preemption
 
 32
 The presumption against preemption is particularly strong when Congress is silent and a federal agency that exercises a detailed and constant supervisory role in the area is also silent. The courts consider regulatory silence to be a more conclusive indication than congressional silence that preemption was not intended. See Hillsborough County v. Automated Medical Laboratories, 471 U.S. 707, 717-18, 721, 105 S.Ct. 2371, 2377-78, 2379, 85 L.Ed.2d 714 (1985). Given the regulations in question and the extra showing needed to preempt by regulation, we conclude that there is indeed no preemption here.
 
 1. The Regulations in Question
 
 33
 When IMI appealed to the Size Appeals Board the determination that Tombs & Sons was a small business, the regulations then in effect provided for proceedings "essentially fact-finding and non-adversarial in nature." Hearings, if provided, were characterized as "investigative in nature and not adversary." They were to be conducted "informally." 13 C.F.R. Sec. 121.3-6(a), (e)(2)(ii) (1983). These regulations have since been revised to provide for a quasi-judicial hearing process. The purpose of the revision was "to avoid scheduling difficulties and delays previously associated with resolution of such appeals by the Size Appeals Board (Board) and to institute procedures that would better satisfy the requirements of due process by providing a more fair and efficient means for obtaining complete and reliable evidence...." 48 Fed.Reg. 55832 (1983). Nowhere in the regulations or in the comments to those regulations is there a statement on preemption.
 
 
 34
 Thus, the process provided at the time of IMI's appeal was administrative rather than quasi-judicial, and the reason given for the later revision does not speak to the availability of state common law remedies. In short, the SBA has been no more explicit on the issue of preemption than has Congress.
 
 2. Preemption by Federal Regulation
 
 35
 Although federal regulations have the same preemptive effect as federal statutes, Fidelity Federal Savings & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982), regulatory preemption is evaluated under a different standard than that applicable to statutory preemption. Regulations without explicit language advancing preemption are less likely than similarly silent statutes to be presumed preemptive. A comprehensive statute may be presumed to occupy the field and preempt state law; however, regulations are specifically intended to flesh out the details necessary to implement Congress' policy in a particular field. Hence, courts must be more cautious in inferring an intent to preempt from the comprehensive nature of regulations. In addition, because agencies exercise their oversight functions on a more routine basis than Congress, they are more likely to be aware of the effect of their regulations than Congress is to be aware of the effect of its laws. Furthermore, agencies are better able to address the details of implementing statutes, and can change their regulations more easily than Congress can alter its statutes. Hillsborough County v. Automated Medical Laboratories, 471 U.S. 707, 718, 105 S.Ct. 2371, 2377-78, 85 L.Ed.2d 714 (1985).
 
 
 36
 The questions to be answered when preemption by regulation is the issue are, first, whether the agency intended to preempt state law, and second, if so and if that decision is a reasonable one, whether Congress intended to give the agency the authority to preempt state law. Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 699-700, 104 S.Ct. 2694, 2700-01, 81 L.Ed.2d 580 (1984); Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n, 461 U.S. 375, 389, 103 S.Ct. 1905, 1915, 76 L.Ed.2d 1 (1983); Fidelity Federal, 458 U.S. at 154, 102 S.Ct. at 3023; State Corp. Comm'n v. Federal Communications Comm'n, 787 F.2d 1421, 1425 (10th Cir.1986). It is not necessary to address the second question here, because it is clear that the SBA has not attempted to preempt state law.
 
 
 37
 The language and results of cases in this area are consistent with the conclusion that unless an agency has explicitly stated an intent to preempt state law, there is a presumption that no such intent exists. The language in the cases stresses the level of detail at which agencies regulate and the relative ease of declaring regulations preemptive, as compared to legislation. Hillsborough County treats the question most eloquently.
 
 
 38
 "We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence....
 
 
 39
 "Moreover, because agencies normally address problems in a detailed manner and can speak through a variety of means, including regulations, preambles, interpretive statements, and responses to comments, we can expect that they will make their intentions clear if they intend for their regulations to be exclusive. Thus, if an agency does not speak to the question of pre-emption, we will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to preempt....
 
 
 40
 "...
 
 
 41
 "Finally, the FDA possesses the authority to promulgate regulations pre-empting local legislation that imperils the supply of plasma and can do so with relative ease.... Moreover, the agency can be expected to monitor, on a continuing basis, the effects on the federal program of local requirements. Thus, since the agency has not suggested that the county ordinances interfere with federal goals, we are reluctant in the absence of strong evidence to find a threat to the federal goal of ensuring sufficient plasma."
 
 
 42
 471 U.S. at 717-18, 721, 105 S.Ct. at 2377, 2379.
 
 
 43
 To the same effect are R.J. Reynolds Tobacco Co. v. Durham County, --- U.S. ----, 107 S.Ct. 499, 511-12, 93 L.Ed.2d 449 (1986) ("Although the regulations are not themselves controlling on the pre-emption issue ... where ... Congress has entrusted an agency with the task of promulgating regulations to carry out the purpose of a statute, ... as part of pre-emption analysis we must consider whether the regulations evidence a desire to occupy the field completely.") and California Coastal Comm'n v. Granite Rock Co., --- U.S. ----, 107 S.Ct. 1419, 1426, 94 L.Ed.2d 577 (1987) ("If ... it is the federal intent that Granite Rock conduct its mining unhindered by any state environmental regulation, one would expect to find the expression of this intent in these Forest Service regulations.... [I]t is appropriate to expect an administrative regulation to declare any intention to pre-empt state law with some specificity....").
 
 
 44
 As far as results are concerned, neither the Supreme Court nor this Circuit has found preemption by federal regulation since Fidelity Federal unless the agency had made an explicit statement. See Granite Rock, --- U.S. ----, 107 S.Ct. 1419, 94 L.Ed.2d 577; R.J. Reynolds, --- U.S. ----, 107 S.Ct. 499, 93 L.Ed. 449; Hillsborough County, 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714; Arkansas Elec. Coop. Corp., 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1; Guschke v. City of Oklahoma City, 763 F.2d 379 (10th Cir.1985).[9] A number of other circuits have also looked to the absence of an explicit statement by an agency to find no preemption. See In re Kennedy, 785 F.2d 1553, 1556 (11th Cir.1986); Tousley v. North American Van Lines, 752 F.2d 96, 102 (4th Cir.1985); KVUE, Inc. v. Austin Broadcasting Corp., 709 F.2d 922, 933-34 (5th Cir.1983), aff'd, 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984); Chicago Title Ins. Co. v. Sherred Village Assocs., 708 F.2d 804, 808 (1st Cir.1983).
 
 
 45
 Conversely, preemption has invariably been found where the agency has made an explicit statement and acted within its authority. See Capitol Cities Cable, 467 U.S. at 701, 104 S.Ct. at 2701; State Corp. Comm'n, 787 F.2d at 1425; see also Ohio Mfrs. Ass'n v. City of Akron, 801 F.2d 824, 832 (6th Cir.1986), cert. denied and appeal dismissed, --- U.S. ----, 108 S.Ct. 44, 98 L.Ed.2d 9 (1987); United Steelworkers of America v. Auchter, 763 F.2d 728, 735-36 (3d Cir.1985); New York State Comm'n on Cable Television v. Federal Communications Comm'n, 749 F.2d 804, 812 (D.C.Cir.1984); KVUE, Inc., 709 F.2d at 934.
 
 
 46
 The SBA's silence on preemption of state remedies is thus strong, although not conclusive, evidence that no preemption is intended. The nature of the size appeals process the SBA has established is further evidence. As described above, the process was deliberately non-judicial at the time of IMI's appeal and was revised for reasons unconnected to preemption. Furthermore, the appeals process is not a remedy in the traditional sense. There is no guarantee that the complaining bidder will be awarded the contract at issue even if the SBA finds that the winning bidder does not meet the size standards.[10] Moreover, if the contract has already been awarded, the winning bidder may suffer no penalty with respect to that contract.[11] It is merely prohibited from bidding on future contracts until it is recertified as a small business.
 
 III.
 
 47
 To summarize, Congress and the SBA are silent as to preemption. There is a presumption that such silence means no preemption. The regulatory protest process available is not a substitute for a right of action. Finally, speaking with respect to another area of exclusively federal law (nuclear safety), the Supreme Court has suggested that "[i]t is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984). These considerations guide us to the conclusion that Congress did not intend to preempt state common law remedies when it enacted the Small Business Act, and that the SBA has not done so.
 
 
 48
 While the dissent's argument is superficially appealing, we are not persuaded. The dissent avoids preemption analysis by stating that
 
 
 49
 "this is not a preemption case at all but rather a case of determining whether Congress has decided that states should be invited to enforce Congress' policies with remedies and forums of the state's choosing.
 
 
 50
 "When looking for the rights of the parties, it is logical to assume that Congress provided the remedies it intended to correspond with the rights it intended. What the majority has done is to treat Congress' immaculate silence on additional rights and remedies as an invitation to imply congressional intent to adopt state remedies as a supplemental means of enforcing its exclusive policies...."
 
 
 51
 Dissent at 2. We think the dissent has overlooked the important principle, noted above, that "the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981). The issue is not whether Congress intended to adopt state remedies as a supplement to enforce federal policies, but whether Congress intended to preclude states from using the SBA standards as evidence of violations of the states' causes of action for fraud, unjust enrichment, or the like, as the states choose to define those causes of action. For the reasons set out above, we can not conclude that Congress so intended. Absent such intent, we think the states are the best judges of whether state causes of action are available.
 
 
 52
 The judgment of the district court is reversed and the case is remanded for further proceedings.
 
 McKAY, Circuit Judge, dissenting:
 
 53
 Whatever rights the plaintiff in this case may have, they arise from two federally legislated programs. The first is federal procurement. The second is a program designed to carry out federal small business policy by granting certain preferences in procurement contracts. No state procurement or small business policy is cited by or implicated by the plaintiff's claims. Whatever rights the plaintiff may have are determined entirely as a matter of congressional intent. Unlike Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), where the Supreme Court was dealing with whether comprehensive federal regulation had ousted the state from its preexisting causes of action for personal injury, there is no preexisting state cause of action for the right to compete for federal procurement contracts or to preference in federal contract awards. Unlike the right to be free from bodily injury, a contract right must be created before it can be interfered with. The contract creator defines both the right and its dimensions. Thus we must look first of all to see, as the majority admits, what Congress has created.
 
 
 54
 The key to analysis in this case is not, in the first instance, what remedies are available to those who are harmed by the "exclusively federal" standards, maj. op. at 487, but whether Congress has created a right in the disappointed bidder which is wider than the remedy Congress has created. Properly speaking, this is not a preemption case at all but rather a case of determining whether Congress has decided that states should be invited to enforce Congress' policies with remedies and forums of the state's choosing.
 
 
 55
 When looking for the rights of the parties, it is logical to assume that Congress provided the remedies it intended to correspond with the rights it intended. What the majority has done is to treat Congress' "immaculate silence" on additional rights and remedies as an invitation to imply congressional intent to adopt state remedies as a supplemental means of enforcing its exclusive policies while simultaneously concluding that the "immaculate silence" precludes the same kind of implied federal remedy which would at least have the virtue of uniformity. It seems to me that implying that Congress intended state remedies is not only unwarranted by Congress' words or debates, but turns the analysis on its head.
 
 
 56
 The strongest argument about legislative intent is the fact that Congress knew it was legislating in two areas that at the time were inventions of its own: federal procurement and federal small business policy. It would seem contradictory to suggest Congress silently intended to rely on the random distribution of state enforcement mechanisms (or their absence, see Tectonics, Inc. v. Castle Const. Co., 496 So.2d 704 (Ala.1986)), to carry out its exclusive policies while at the same time silently intending to exclude federal enforcement actions other than those carefully spelled out in the act. See Savini Constr. Co. v. Crooks Bros. Constr. Co., 540 F.2d 1355 (9th Cir.1974). Indeed, since the rights of the plaintiff, if any, are of federal creation, implying that state remedies were intended has not only all the evils which Savini (and by implication, this court) recites to preclude implying a federal cause of action but the additional evil of diverse and unpredictable results in fifty jurisdictions. It is not enough to cite the possibility that states traditionally have had causes of action for fraud and unjust enrichment. Those actions are based on interference with underlying legal rights. They are not independent causes of action such as actions for personal injury. One must first find that Congress intended that a disappointed bidder be treated as one defrauded of some right Congress created or that an ineligible bidder has been unjustly enriched at the legal expense of another wise eligible bidder. No matter how well defined remedies are, they are not available until there exists some right to which they may attach.
 
 
 57
 There are strong reasons to suggest Congress intended no wider package of rights and corresponding remedies than it expressly provided. While they are recited by the majority in its quotation from Savini, it is important to reemphasize that the obvious conclusion to be drawn from Congress' explicit enforcement scheme is that its procurement needs take precedence over its policy of encouraging small businesses. While the majority takes considerable comfort from the fact that here we have a prior determination by the congressionally authorized agency that the defendant was not a qualified bidder, nothing in the majority opinion does or could logically suggest that along with an implied state cause of action there is an implied duty to exhaust federal administrative procedures. If the court is, in fact, suggesting otherwise, it seems to me it has shifted its theory from preemption to state enforcement of a federal cause of action. Since under the majority's approach these are state causes of action,* they can be brought in the several state courts without prior protest or administrative finding. Without federal guidance, the state courts are at liberty to decide for themselves whether the successful bidder was qualified; whether the second bidder was also qualified; and whether there was fraud or unjust enrichment or interference with a contract "right." Even when brought in federal court, as this case was, we must assume that the trial court would look to state law to determine the scope of the state law of fraud, unjust enrichment, or such other theories as imaginative lawyers might plead.
 
 
 58
 It is not the successful suit alone which discourages bidders from entering the field, but the well-known cost of defending unsuccessful suits. In cases such as this, those suits would normally be classed as complex litigation if they involved issues of valuation. It would be less discouraging to face an implied federal cause of action than fifty uncertain state ones. Against these negatives, we should be reluctant to imply congressional intent either to rely on state enforcement mechanisms or to have created, in unsuccessful bidders, a substantive "right" larger than Congress' remedies.
 
 
 59
 It seems to me that the Alabama Supreme Court in Tectonics, 496 So.2d at 704, has it over this federal court in interpreting federal congressional intention when it said there is "absolutely no logic in interpreting the Small Business Act to allow a state cause of action." 496 So.2d at 706. We ought to do what they have done (and as, by implication, we have done as a matter of federal subject matter jurisdiction)--refuse to imply causes of action which Congress concluded not to create. I would affirm.
 
 
 
 [1]
 Although the case was tried below, the district court made no factual findings because it concluded that federal law preempted the state common law actions under which IMI sued. The facts are not in dispute on this appeal, however
 
 
 [2]
 To qualify as a small business for set-aside contracts in 1982, business receipts for the three years immediately preceding the date of bidding could not average more than $5.5 million per year. Tombs self-certified to the contracting office at West Point that it was a small business, although its accountant had advised in the summer or fall of 1981 that Tombs' financial statements indicated that it had become a large business under SBA standards. Statutory penalties apply for false self-certification. 15 U.S.C. Sec. 645 (1982 & West Supp.1987)
 
 
 [3]
 Congress has provided criminal penalties for false statements, overvaluation of securities, embezzlement, and like offenses. 15 U.S.C. Sec. 645 (1982 & West Supp.1987)
 
 
 [4]
 The parties agreed below that there is no federal right of action in this case. 614 F.Supp. at 244-45. We thus assume without deciding that an unsuccessful bidder on a set-aside contract has no federal right to sue the successful low bidder for false self-certification. Cf. Tectonics Inc. v. Castle Constr. Co., 753 F.2d 957, 960-61 (11th Cir.) (holding that there is no federal private cause of action under the Small Business Act), cert. denied, 474 U.S. 848, 106 S.Ct. 143, 88 L.Ed.2d 118 (1985); Savini Constr. Co. v. Crooks Bros. Constr. Co., 540 F.2d 1355, 1359 (9th Cir.1974) (same); Northland Equities, Inc. v. Gateway Center Corp., 441 F.Supp. 259, 261 (E.D.Pa.1977) (relying in part on Savini )
 
 
 [5]
 Tombs maintains that factor five is also implicated, arguing that "Congress clearly intended to preempt the field of government procurement contracts" through its extensive regulation. Brief of Defendant-Appellee at 7. We do assume that the several states may not regulate the manner in which federal procurement contracts are awarded. Congress has not spoken on the question with which we are here concerned, however, namely whether states may use a violation of the federal SBA standards as evidence of violations of state created causes of action. Our conclusion that the SBA's regulations do not operate to preempt state common law remedies is discussed more fully in Part III
 
 
 [6]
 See note 9 for a fuller discussion of this rule
 
 
 [7]
 Review under the Administrative Procedure Act is limited to a determination of whether agency action such as awarding a contract was arbitrary and capricious, or an abuse of discretion. See Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 869 (D.C.Cir.1970). While the court may overturn such a decision, it may not then establish a new contract. See id
 
 
 [8]
 The dissent relies on Tectonics, 496 So.2d 704, to support its conclusion that Congress intended not to permit state causes of action for violations of SBA standards. Tectonics was a 5-4 decision interpreting the law of Alabama. In our view, the dissent's rephrasing of the certified question better describes what is at issue: "Whether [the state] would use that portion of the Small Business Act which defines what a small business is, and the Small Business Administration's determination in a particular case as to what a small business is, as evidence in a state cause of action for fraud, unjust enrichment, or interference with a business relationship?" Id. at 706 (Adams J., dissenting) (emphasis added)
 
 
 [9]
 We do not hold that the presumption based on agency silence may not be overcome. Direct conflict between federal regulations and state law would clearly lead to preemption, even in the absence of an explicit agency statement. See Grocery Mfrs. of America v. Gerace, 755 F.2d 993 (2d Cir.1985) (finding preemption where state statute in direct conflict with valid federal regulation), aff'd, 474 U.S. 801, 106 S.Ct. 36, 88 L.Ed.2d 29, cert. denied, 474 U.S. 820, 106 S.Ct. 69, 88 L.Ed.2d 56 (1986). We express no opinion on what other circumstances, if any, would justify a finding of preemption in the face of agency silence
 
 
 [10]
 See, e.g., Cincinnati Elec. Corp. v. Kleppe, 509 F.2d 1080, 1089 (6th Cir.1975) (court may not issue injunction in favor of second low bidder because that bidder "has no right to have the contract awarded to it" and has adequate remedy for recovery of costs of preparing bid)
 
 
 [11]
 It is unclear just what the SBA's policy or practice in this situation is. Current SBA regulations do not speak to the issue, see 13 C.F.R. Sec. 121.8-.9 (1987). In contrast, we note the clarity of the relevant section of the Federal Acquisition Regulations, 48 C.F.R. Sec. 19.302 (1986). There is case law to the effect that even if a successful bidder is found not to be a small business, it is a breach of contract for the government subsequently to award the contract to another bidder after the contract has been awarded or a notice of award has been sent. See Allen M. Campbell Co. v. United States, 467 F.2d 931, 199 Ct.Cl. 515 (1972); MidWest Constr. Co. v. United States, 387 F.2d 957, 962, 181 Ct.Cl. 774 (1967); see also Foley Constr. Co. v. United States Army Corps of Eng'rs, 716 F.2d 1202, 1206 (8th Cir.) (holding it reasonable for the government to argue that it could properly proceed with contract already awarded), cert. denied, 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1983); 48 C.F.R. Sec. 19.302(g)(2), (i) (1986). This case law would presumably explain why the SBA appeals office dismissed a size determination appeal as moot after a contract had been awarded. See Fordice Constr. Co. v. Central States Dredging Co., 631 F.Supp. 1536, 1537 (S.D.Miss.1986); see also 13 C.F.R. Sec. 121.8(b) (1987) ("Once properly instituted ... formal size determinations may be completed even if ... the Government procurement or sale is cancelled or awarded.") (emphasis added). Yet in the most recent case, the successful bidder was debarred from the contract and the contract was rebid. See John C. Holland Enters., Inc. v. J.P. Mascaro & Sons, Inc., 653 F.Supp. 1242, 1243 (E.D.Va.1987)
 
 
 *
 This court appears to be treating causes of action and remedies interchangeably when discussing this case. In my view, the two concepts may be coextensive but not interchangeable