The **LOUISIANA LAND AND EXPLORATION COMPANY,**
Plaintiff–Appellee,

v.

**PILOT PETROLEUM CORPORATION,**
Defendant–Appellant.

No. 88–3662.

United States Court of Appeals,
Fifth Circuit.

May 10, 1990.

Robert B. Deane, Douglas Grundmeyer, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, La., for defendant-appellant.

John Breckenridge, Asst. Atty. Gen., Montgomery, Ala., for intervenor State of Ala.

Katherine Goldman, John F. Landrum, Milling, Benson, Woodward, Hillyer, Pier-

son & Miller, New Orleans, La., for plaintiff-appellee.

Before BROWN, WILLIAMS, and JOLLY, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The question this case presents is whether the state of Alabama may tax jet fuel, which is sold for export to a foreign country. Pilot Petroleum Corporation argues that the Alabama tax [1] violates the Import–Export Clause [2] of the United States Constitution. The district court granted the Louisiana Land & Exploration Company's motion for summary judgment. After this court certified to Alabama's attorney general that the constitutionality of its excise fuel tax had been drawn in question,[3] in response to which we sought and obtained extensive briefs, the state of Alabama intervened. We hold that the tax is unconstitutional and we reverse the decision below.

### How It All Came About

Pilot Petroleum Corporation (Pilot) contracted with the Louisiana Land & Exploration Company (LL & E) to purchase approximately 112,000 barrels of jet fuel oil.[4] On November 7, 1986, LL & E delivered the fuel free on board the Liberian flagged tanker, MARYANN, while it was anchored in the port of Mobile, Alabama. The fuel was then exported to Halifax, Nova Scotia, Canada. Following delivery, Pilot received two invoices for the purchase price of the fuel. The first invoice totalled $201,929.78, including $5,390.78 which was attributable to fuel tax. The second invoice charged $50,400.00 for fuel tax out of a total bill of $1,772,400.00. Pilot paid LL & E, excluding the amounts attributable to the Alabama state tax.

In November, 1986, LL & E paid to the Alabama Department of Revenue the tax due as a result of its fuel sale to Pilot, despite the fact that it had not been paid the amount of the tax by Pilot. LL & E filed a petition for refund in August, 1987, which contended that Pilot was exempt from the tax under Alabama law because it was properly licensed and bonded. Alabama law provides that licensed distributors are exempt from the excise fuel tax.[5] Because Pilot did not become a licensed distributor until December 15, 1986, which was after the date of the fuel sale, the Department denied LL & E's request for

---

1. Alabama law provides:

   Every distributor, refiner, retail dealer, storer or user of gasoline or any substitute or device therefor sold for use as a fuel to propel aircraft shall collect and pay over to the state department of revenue an excise tax in accordance with the following schedule upon the selling, use or consumption, distributing, storing or withdrawing from storage in this state for use as a fuel to propel aircraft: ... b. Any fuel used to propel aircraft powered by jet or turbine engines shall be taxed at the rate of nine-tenths one cent per gallon.
   ALA. CODE § 40–17–31(d)(1) (1975).

2. The Import Export Clause states: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws ..." U.S. CONST. Art. I, § 10, cl. 2.

3. Pursuant to federal law:

   In any action, suit, or proceeding in a court of the United States to which a State ... is not a party, wherein the constitutionality of any statute of that State affecting the public interest is drawn in question, the court shall certify such fact to the attorney general of the State, and shall permit the State to intervene for presentation of evidence, if evidence is otherwise admissible in the case, and for argument on the question of constitutionality. 28 U.S.C. § 2403(b).

4. Pilot first contacted Karbon Corporation, a petroleum products broker, for the purpose of purchasing jet fuel. On November 4, 1986, Karbon transmitted to LL & E a telex confirming the sale by LL & E to Pilot of approximately 100,000 barrels of jet fuel at the price of .4100 cents per gallon. On November 7, Karbon sent a second telex confirming the sale of approximately 12,000 barrels at .4375 cents per barrel.

5. Section 40–17–32 provides in part:

   The excise tax imposed by 40–17–31 shall be collected by persons, as defined in this article, storing gasoline or distributing the same ... provided, that receipts by any licensed distributors ... shall be treated on the same basis as gasoline received or distributed by such licensed distributors in interstate commerce.
   ALA. CODE § 40–17–32 (1975).

refund.[6]

Pilot never reimbursed LL & E for the tax LL & E paid on its behalf. LL & E then filed this suit in the United States District Court for the Eastern District of Louisiana. The district court concluded that the purchaser bears ultimate responsibility for the payment of taxes under both Alabama law and the LL & E–Pilot contract. The court further held that Pilot should first exhaust its administrative remedies by paying the tax and petitioning the Alabama Department of Revenue, and then file suit against the state of Alabama to challenge the constitutionality of the tax. Pilot appeals.

### District Court Had Jurisdiction to Examine Constitutionality

■ In a strange twist, considering that the constitutionality of state laws or practices is a major part of the grist of federal district courts, the district court directed Pilot to pursue administrative remedies in the state of Alabama before raising any constitutional defense in the federal courts. Yet, the Alabama Code allows refunds only to taxpayers who pay taxes directly to the Alabama Department of Revenue.[7] Therefore, because Pilot does not pay the tax to the State of Alabama, it has no standing to pursue a refund of the tax paid by LL & E supposedly on Pilot's behalf.

6. Prior to delivery, Pilot contacted the Alabama Department of Revenue to obtain information regarding the requirements imposed by Alabama law which would apply to the sale. Pilot obtained a bond as required by the Revenue Department on December 3, 1986. Pilot also applied to obtain a gasoline license per the Department's directives. However, Pilot was later informed by the Department that the license application was defective. Pilot filed a corrected application and received its license on December 15, 1986.

Alabama law provides that sales between licensed distributors are exempt from the fuel excise tax. LL & E was licensed by the state of Alabama to sell and export gasoline products from Alabama.

Had Pilot obtained its license before or on the date of the sale in question, the issue of the constitutionality of the state fuel tax would not be before us today.

■ In addition, LL & E claims that the district court was barred from deciding the tax's constitutionality based on the Tax Injunction Act.[8] The Act forbids federal district courts from "enjoining, suspending or restraining the assessment, levy or collection" of any state tax when that state offers a plain, efficient, and speedy remedy. The Tax Injunction Act does not bar federal court jurisdiction in this case, however, because this suit was filed to collect a state tax, rather than enjoin, suspend, or restrain the collection of taxes.[9] Furthermore, LL & E chose to bring this suit in the Eastern District Court of Louisiana; and it can not now limit Pilot's defenses.

Even if Pilot had alternative adequate means to challenge the constitutionality of the Alabama tax, this case should be viewed primarily as a dispute between the state of Alabama and Pilot. Pursuant to section 40–17–31(e) of the Alabama Code, the retailer or distributor is required to add the amount of the excise tax to the price of the fuel.[10] Although the code places responsibility for the collection of taxes on the delivering party, it specifically provides that the tax "is in fact a levy on the consumer or user with distributor ... acting merely as an agent of the state for the collection and payment of the tax to the state."[11] Because LL & E acts as a mere agent for the state in the collection of taxes, this suit, in effect, is between the state of Alabama and Pilot Petroleum.

7. The Alabama Code provides:

Where any taxpayer in the payment of taxes or licenses which are paid directly to the Department of Revenue, by a mistake of fact or law has paid an amount in excess of the amount due or has made an erroneous payment ... the treasurer is authorized to pay such warrant for the amount of such overpayment or erroneous payment.
ALA.CODE § 40–1–34 (1975).

8. Tax Injunction Act, 28 U.S.C. § 1341.

9. *See Hargrave v. McKinney,* 413 F.2d 320 (5th Cir.1969).

10. ALA.CODE § 40–17–31(e) (1975).

11. *Id.*

*Down to Basics:*

*Constitutionality of the Tax*

The LL & E–Pilot contract clearly places responsibility for payment of the tax on Pilot. Section 5 of the General Provisions of the contract mandates that the receiving party [Pilot] reimburse the delivering party [LL & E] for all taxes "legally required to be paid", which are paid by the delivering party on behalf of the receiving party. Although it was probably never in the contemplation of these parties that they were facing or were even close to a constitutional problem which goes back to the very formation of this new nation, the contract provides that Pilot must pay only taxes that are "legally required to be paid". This language necessarily calls into question the constitutionality of the Alabama tax.

### A. Evolution of the Import–Export Clause

The Import–Export Clause of the United States Constitution states that "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports."

Pilot relies on *Richfield Oil Corp. v. State Bd. of Equalization*, 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946), to support its claim that the Alabama excise tax is a tax on exports and therefore violates the Import–Export Clause. In *Richfield,* the Richfield Oil Company entered into a contract with the New Zealand government for the sale of oil f.o.b. Los Angeles. Richfield delivered the oil by pipeline from its refinery in California to its storage tanks at the harbor where the naval tanker, R.F.A. Nucula, received the oil from the shore tanks into its ship tanks. The oil was then transported to Auckland, New Zealand. No portion of the oil was used in the United States. California assessed a retail sales tax against Richfield measured by the gross receipts of the transaction. The Court reasoned that when the oil was pumped into the ship's tanks, the movement of the oil abroad had commenced since the parties were certain that the oil would not be diverted for domestic use.

Thus, the Court concluded that the sales tax constituted an impost upon an export within the meaning of the Import–Export Clause of the United States Constitution.

*Richfield* has never been overruled by the United States Supreme Court. However, in *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976), the Court initiated a new approach to the Import–Export Clause. In *Michelin,* the Georgia tax commissioner assessed ad valorem property taxes against tires and tubes imported by Michelin from France and Nova Scotia. Instead of attempting to determine whether the tires and tubes were in fact imports under the Import–Export Clause, the *Michelin* court focused on the nature of the Georgia tax. Specifically, the Court outlined three policies that were to be served by the Clause.

First, the Federal Government must speak with one voice when regulating commercial relations with foreign governments. For example, tariffs which might affect foreign relations could not be implemented by the States consistently with that exclusive power. Second, import revenues were to be the major source of revenue for the Federal Government and should not be diverted to the States. Finally, harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically. *Michelin,* 423 U.S. at 285–86, 96 S.Ct. at 540–41, 46 L.Ed.2d at 503.

The Court decided that the ad valorem property tax did not offend any of these policies. First, the tax had no impact upon the federal government's exclusive regulation of foreign commerce because, "by definition, such a tax does not fall on imports as such because of their place of origin." It could not be used to create special protective tariffs or preferences for certain domestic goods; nor could it be applied selectively to encourage or discourage importation in a manner inconsistent with federal regulation. Second, the tax did not

deprive the federal government of any revenues to which it was entitled. Property taxes are taxes by which a state apportions the cost of police and fire protection, which was supplied by the local government. Importers should bear these costs, as well. Although the tax may have a minimal effect on the cost of imports to consumers, the court recognized that the resulting variance in demand for imports would not be large enough to significantly diminish the number of imports upon which the federal government could levy duties so as not to indirectly deprive it of income. Finally, harmony among the states was not disturbed by such a property tax because inland states would be paying only for protective services rendered by coastal states.

Because prohibition of a nondiscriminatory ad valorem property tax did not further any of these objectives of the Import–Export Clause, the Court held that the Georgia tax was not an "impost" or "duty" within the meaning of the Import–Export Clause. However, the Court limited its holding to taxes levied on goods no longer in transit. *Michelin*, 423 U.S. at 302, 96 S.Ct. at 548, 46 L.Ed.2d at 512. It concluded that nothing in the history of the Clause "even remotely suggests that a nondiscriminatory ad valorem property tax which is also imposed on imported goods that are no longer in import transit was the type of tax that was regarded as objectionable by the Framers." *Michelin*, 423 U.S. at 286, 96 S.Ct. at 541, 46 L.Ed.2d at 503. Therefore, the *Michelin* court left open the question of whether a tax on goods in transit would constitute an "impost" or "duty" under the Import–Export Clause.

In *Washington Revenue Dep't v. Stevedoring Ass'n*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), the state of Washington applied a tax to income received from stevedoring[12] activities. Using the *Michelin* three-prong policy test, the Court found that none of the policies were threatened by Washington's business tax. 1) The Federal Government's ability to conduct foreign policy was not affected. Because all businesses were taxed, special protective tariffs would not be created. Additionally, a foreign business or vessel was not being taxed. 2) Federal import revenues were not affected for the same reasons as in *Michelin*. In fact, the tax's effect on the demand for imported goods was even less substantial than as in *Michelin* because Washington taxed only the value of the loading and unloading of the goods, not the value of the goods themselves. 3) Since the tax only compensated the government for providing protective services, it would not upset harmony among the states.

Although the Court found that the Washington tax did not disturb any of the three policies of the Clause, it still had to address the fact that the stevedoring activities were taxed while the exported and imported goods were in transit. Thus, the U.S. Supreme Court was faced with the question of whether a business and occupation tax on activities related to in-transit imports and exports violates the Import–Export Clause. Because of the indirect nature of the tax, i.e., the tax did not relate to the value of the goods, the Court refused to discard the *Michelin* approach merely because the goods were in transit. The Court expressly refused to reach the issue now before us today: whether a state may directly tax imports or exports that are in transit. *Washington Stevedoring*, 435 U.S. at 757 n. 23, 98 S.Ct. at 1403 n. 23, 55 L.Ed.2d at 702 n. 23.

### B. In–Transit Exports Are Still Within the Clause

■ It is true that the Import–Export Clause no longer forbids states from taxing all imports and exports without the consent of Congress. The broad prohibition against any and all taxation upon imports and exports has been discarded. However, we believe, consistent with the contemporary view of the Supreme Court, that the Import–Export Clause was specifically intended to prevent the type of taxation involved in this case.

One of the primary reasons for calling the Constitutional Convention of 1787 was

---

**12.** Stevedoring is the business of loading and unloading cargo from ships.

to prevent states from inhibiting commerce among themselves and with foreign countries. Before the Convention, coastal states taxed imported goods that were destined for inland states. Inland states, or states having no convenient ports, were subject to unfair taxation by their neighboring states. As one of the serious controversies before them, the Framers sought to alleviate this problem with the enactment of the Commerce and Import–Export Clause. *See Michelin*, 423 U.S. at 283–84, 96 S.Ct. at 539–40, 46 L.Ed.2d at 502 (quoting 3 M. Farrand, The Records of the Federal Convention of 1787 542 (1911)). Thus, the policies animating both Clauses are the same.

Where the protections of the Commerce Clause have been invoked, the Supreme Court has stated that "laws which concern the exterior relations of the United States with other nations and governments are general in their nature, and should proceed exclusively from the legislative authority of the nation." *Bowman v. Chicago & N.R. Co.*, 125 U.S. 465, 482, 8 S.Ct. 689, 697, 31 L.Ed. 700, 706 (1888). Stated another way, the United States Government must speak with one voice when regulating commercial relations with foreign governments. *Michelin*, 423 U.S. at 285, 96 S.Ct. at 540, 46 L.Ed.2d at 503. To permit any and every state to impose a direct tax on goods in the export stream would circumvent this objective.

In this case, the jet fuel was delivered aboard a foreign vessel which was bound for Nova Scotia, Canada. No question existed about its destination. Alabama's excise tax on fuel adversely affects United States' foreign commerce with respect to this very important commodity. The foreign shipment of oil is accomplished primarily through the use of oil tankers. This type of tax discourages foreign parties, who purchase oil from U.S. companies and refineries, from using U.S. ports to transport fuel from the United States into foreign countries. Additionally, coastal states which possess ports like the Port of Mobile, Alabama derive significant amounts of revenue from this tax, since they are able to tax the large quantities of fuel that is pumped from their port into the tankers.

The Alabama excise fuel tax is not an indirect tax like the taxes levied in *Michelin* and *Washington Stevedoring*: it is not an assessment imposed on stored inventory which includes imported or exported products, nor is it a tax on a business or occupation which is related to the importation or exportation process. Rather, the Alabama fuel tax in this case is a tax that is levied on the goods themselves while they are in transit. As in *Richfield*, the fuel was delivered f.o.b. into the tanks of a foreign flagged tanker for export to a foreign country. Without contradiction, the oil was in transit. It was the subject of foreign export at the time of taxation.

We conclude that the Alabama fuel tax is an impost upon an export within the meaning of the Import–Export Clause, and is therefore unconstitutional. The decision of the district court is in error.

REVERSED.

E. GRADY JOLLY, Circuit Judge, dissenting:

With respect for the majority's view, I dissent, because, first, the contract in this case does not call into question the constitutionality of Alabama's jet fuel tax. Second, even if we must consider the constitutionality of this tax, a non-discriminatory property tax that applies equally to sales, consumption and storage of all jet fuel is plainly not prohibited by the constitution's Import–Export Clause simply because some of the taxed fuel is exported.

The majority opinion summarily concludes that the language of the contract at issue "necessarily calls into question the constitutionality of the Alabama tax." The majority reads the provision "legally required to be paid" to mean duly or properly imposed in accordance with law. It reaches this interpretation although admitting that "it was probably never in the contemplation of these parties that they were facing or were even close to a constitutional problem." Maj. op. at 819. The phrase "legally required to be paid" should be read as simply an awkward expression for

"payable by law." This reading would effect the parties' stated intent to shift "product taxes, fees or charges imposed [by government entities] on the Delivering Party [LL & E]" to the receiving party, Pilot, without also passing on extra-legal charges arbitrarily imposed by port authorities. . Because the jet fuel tax was required by a duly enacted law of the state of Alabama, the contract clearly placed the cost on Pilot. In short, the majority gives the contract an artificial reading to reach the constitutional question, which is contrary to the general proposition that we should avoid constitutional issues when there are non-constitutional grounds upon which the case can be decided. *Matter of Hipp, Inc.*, 895 F.2d 1503, 1509 (5th Cir. 1990) (cases cited therein).

Even if the contract requires that we consider the constitutionality of the tax, the majority erred in concluding that "the Import–Export Clause was specifically intended to prevent the type of taxation involved in this case." Maj. op. at 820. In reaching its conclusion, the majority reviews the past and recent history of the Clause and observes that the Supreme Court has not explicitly addressed the Clause's application to direct taxes on goods "in transit." The Court's recent decisions, however, make clear that even a tax operating directly on goods "in transit" is not prohibited if it is non-discriminatory and does not frustrate the policies underlying the Clause. Alabama's tax is unquestionably non-discriminatory; it applies equally to all fuel sold or handled for use by anyone, domestically or for export. "Failure to assess the tax would shift the tax burden from [the exporter] and the ultimate consumers of its ... products to the local taxpayers of [Alabama]—a result completely at odds with *Michelin.*" *R.J. Reynolds Tobacco Co. v. Durham County, N.C.*, 479 U.S. 130, 107 S.Ct. 499, 514, 93 L.Ed.2d 449 (1986) (nondiscriminatory ad valorem tax that applied to imported tobacco not prohibited by Clause because it "is nothing more than a means 'by which a State apportions the cost of such services as police and fire protection among the beneficiaries according to their respective

wealth.'") *Id., citing Michelin*, 423 U.S. 276, 287, 96 S.Ct. 535, 541, 46 L.Ed.2d 495 (1976).

Contrary to the majority's conclusion, Alabama's tax does not frustrate the three policies underlying the Import–Export Clause: federal revenue collection, unitary federal foreign economic policy and interstate commercial harmony. There can be no interference with federal revenue collection because the federal government may not tax exports. U.S. Const., Art. I, § 9. Although all property or excise taxes that fall on imports and exports in some sense affect foreign economic policy,

> it is obvious that such nondiscriminatory property taxation can have no impact whatsoever on the Federal Government's exclusive regulation of foreign commerce, probably the most important purpose of the Clause's prohibition. By definition, such a tax does not fall on [exports] as such because of their place of [destination]. It cannot be used to create special protective tariffs or particular preferences for certain domestic goods, and it cannot be applied selectively to encourage or discourage any [exportation] in a manner inconsistent with federal regulation.

*Michelin Tire Corp. v. Wages*, 423 U.S. 276, 286, 96 S.Ct. 535, 541, 46 L.Ed.2d 495 (1976).

Finally, although "allowance of nondiscriminatory ad valorem property taxation may increase the cost of goods purchased by 'inland consumers' ... such taxation is the *quid pro quo* for benefits actually conferred by the taxing state." *Michelin*, 423 U.S. at 288–89, 96 S.Ct. at 542. The majority is surely correct that most oil exports are by tanker and that only coastal states can tax this form of commerce; by the same token it is only coastal states that bear the regulatory, administrative and, increasingly, environmental, costs of this commerce. The Framers did not intend such states to bear all these costs, and this nondiscriminatory tax imposed at the Mobile, Alabama port on fuel, which happened

to be exported, is not unconstitutional. I therefore respectfully dissent.