**ITEL CONTAINERS INTERNATIONAL CORPORATION, Plaintiff/Appellant,**

v.

**Charles E. CARDWELL, Commissioner of Revenue, State of Tennessee, Defendant/Appellee.**

Supreme Court of Tennessee,
at Nashville.

April 22, 1991.

Phillip W. Collier, James C. Seiffert, T. Morgan Ward, Jr., Louisville, James C. Gooch, Michael D. Sontag, Nashville, for plaintiff-appellant.

Charles W. Burson, Atty. Gen. and Reporter, Daryl J. Brand, Asst. Atty. Gen., Nashville, for appellee.

Charles A. Trost, Nashville, Edward A. Woolley, Bedford, N.Y., for amicus curiae Institute of Intern. Container Lessors.

## OPINION

ANDERSON, Justice.

This case presents the question whether Tennessee may constitutionally impose a sales tax upon the transfer of possession in Tennessee of domestically-owned cargo containers used exclusively in international commerce. The Chancellor held that the imposition of such a tax is constitutionally permissible. We agree and affirm.

The facts were stipulated at trial as follows:

Itel Containers International Corporation ("Itel") is a Delaware corporation, with its principal place of business in San Francisco, California. Itel's principal business is the leasing of cargo containers which are used exclusively in international commerce. These containers are manufactured and purchased abroad by Itel, and enter the United States as instruments of international traffic. Itel has posted with the United States Customs Service a continuous bond which guarantees payment of all duties, taxes, or liquidated damages which could be assessed for a failure to comply with government regulations regarding Itel's withdrawal of any of the containers from international commerce.

Itel solicits container leases world-wide through its marketing offices located in numerous U.S. cities, but Itel conducts no marketing solicitation from any Tennessee location. Itel accepts leases of its containers only in its San Francisco office. All of its container leases restrict the use of the containers to international commerce. As a result of its international operations, Itel

allows its customers to pick up and re-deliver containers at numerous locations around the world and in the United States.

In Tennessee, Itel receives, repairs, stores, and delivers containers at its terminal building in Memphis, and also, by contract with other independent terminals, at two other Tennessee locations. Itel is registered as a dealer with the Tennessee Department of Revenue, and collects and remits sales and use tax on fees which it collects for repair services rendered in Tennessee.

The tax assessment complained of in this appeal is based upon Itel's leases of its cargo containers which were delivered in Tennessee to international carriers for international shipments. These leases began when the carriers took delivery of the containers at Itel's Tennessee locations.

Itel earns no revenue from the use of the containers while they are present in Tennessee, until they are picked up by the international carrier/lessee. The Department of Revenue computed the sales tax based upon its calculation of the average container days leased, and the average number of containers leased per month. Itel paid the assessment of tax, penalties, and interest under protest, and filed this action to recover those sums.

## QUESTIONS PRESENTED

Itel challenges the validity of the tax assessment, I. on the statutory grounds that the mere transfer of possession of cargo containers in Tennessee is not a "sale" according to Tenn.Code Ann. § 67-6-102(23)(A), and that because its containers have not "become a part of the mass of property in this state," they are exempt from Tennessee sales tax pursuant to Tenn.Code Ann. § 67-6-211; II. alternatively, Itel asserts that Tennessee's imposition of a sales tax upon leases of federally bonded instruments of international traffic violates the Commerce, Supremacy, Import/Export, and Due Process clauses of the United States Constitution.

## I.

## STATUTORY AUTHORITY TO TAX

██ Itel argues that the mere transfer of possession of leased property in Tennessee is not a taxable event. The Tennessee Retailers' Sales Tax Act imposes sales tax on the lease or rental of tangible personal property in this state. Tennessee Code Annotated § 67-6-201 provides:

It is declared to be the legislative intent that every person is exercising a taxable privilege who engages in the business of selling tangible personal property at retail in this state ... or who rents or furnishes any of the things or services taxable under this chapter ... or who leases or rents such property, either as lessor or lessee, within the state of Tennessee....

"Lease or rental" is also included within the statutory definition of "sale:"

"Sale" means *any transfer of* title or *possession,* or both, exchange, barter, *lease or rental,* conditional or otherwise, in any manner or by any means whatsoever of tangible personal property *for a consideration....*

Tenn.Code Ann. § 67-6-102(23)(A) (emphasis added).

Itel cites *Magnavox Consumer Electronics v. King,* 707 S.W.2d 504 (Tenn. 1986), in support of its assertion that the legislature intended only to tax proceeds of leases entered into within Tennessee. In *Magnavox* we considered whether the use of vehicles by a lessee pursuant to a vehicle lease entered into in the state of Indiana were subject to Tennessee's use tax, Tenn. Code Ann. § 67-6-210. Itel's reliance on *Magnavox* could not be more misplaced, however, because in *Magnavox* we held that the use tax may be imposed upon lessees who lease property outside of this state for use in Tennessee.

No other authority is cited by Itel for its assertion, and we find that the statutory language quoted above is a clear declaration of the legislature's intent to tax the transfer of possession of tangible personal property in Tennessee, pursuant to lease agreements executed outside of Tennessee.

■ Itel argues that the delivery of its containers in Tennessee is exempt from taxation pursuant to Tenn.Code Ann. § 67–6–211, because its containers have not "come to rest" in Tennessee. Tennessee Code Annotated § 67–6–211 declares:

It is ·the intention of this chapter to levy a tax on the sale at retail, the use, the consumption, the distribution, and the storage to be used or consumed in this state of tangible personal property after it has come to rest in this state and has become a part of the mass of property in this state.

We have held that this statute was intended "to extend the taxing power of the state of Tennessee to the fullest extent under the Commerce Clause," *Texas Eastern Transmission Corporation v. Benson,* 480 S.W.2d 905, 907 (Tenn.1972), and that "where a tax does not constitute a violation of the Commerce Clause, no exemption is available under [the statute]," *Williams Rentals, Inc. v. Tidwell,* 516 S.W.2d 614, 615 (Tenn.1974). Consequently, the next question to be resolved is whether the challenged tax assessment violates the Commerce Clause of the United States Constitution.

## II.

### UNITED STATES CONSTITUTIONAL AUTHORITY TO TAX

Initially, we note that the United States Supreme Court has held that California's imposition of its *ad valorem* property tax, assessed upon the value of identical cargo containers used exclusively in foreign commerce, violated the Commerce Clause. In *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979), the Court held that

the Constitution confers no immunity from state taxation, and ... interstate commerce must bear its fair share of the state tax burden. Instrumentalities of interstate commerce are no exception to this rule ... if the state tax is applied to an activity with a substantial nexus with the taxing state, is fairly apportioned,

does not discriminate against interstate commerce, and is fairly related to the services provided by the state, no impermissible burden on interstate commerce will be found. *Complete Auto Transit v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 1079 [51 L.Ed.2d 326] (1977).

441 U.S. at 444–45, 99 S.Ct. at 1819 (other citations omitted). The Court assumed that "if the containers were instrumentalities of interstate commerce, *Complete Auto* would apply and be satisfied...." 441 U.S. at 445, 99 S.Ct. at 1820.

Next, however, the Court held that Japan Line's containers "are instrumentalities of foreign commerce, both as a matter of fact and as a matter of law," 441 U.S. at 445–446, 99 S.Ct. at 1820, and that when a state seeks to tax the instrumentalities of foreign commerce, rather than of interstate commerce,

a court must also inquire, first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the federal government from speaking with one voice when regulating commercial relations with foreign governments. If a state tax contravenes either of these precepts, it is unconstitutional under the Commerce Clause.

*Japan Line,* 441 U.S. at 451, 99 S.Ct. at 1823. Applying this test, the Supreme Court held that California's imposition of its property tax upon Japanese-owned shipping containers violated the Commerce Clause because the tax "results in multiple taxation of the instrumentalities of foreign commerce," and the tax "prevents this nation from speaking with one voice in regulating foreign trade." *Japan Line,* 99 S.Ct. at 1823.

Itel's containers, like Japan Line's containers, are instrumentalities of foreign commerce. The United States is a signatory to at least two international agreements concerning these containers. The Customs Convention on Containers [1] grants containers "temporary admission free of import duties and import taxes and free of import

---

1. 20 U.S.T. 301, 304, T.I.A.S. No. 6634 (1969).

prohibitions and restrictions," provided they are used solely in foreign commerce and subject to re-exportation. Japan and the United States are signatories to a Bilateral Tax Convention[2] which, in order to prohibit double taxation of cargo containers, provides that

> "income derived by *a resident of a contracting state ... from the* use, maintenance, and *lease of containers* and related equipment ... in connection with the operation in international traffic of ships or aircraft ... is exempt from tax in the *other* contracting state."

*Id.* (emphasis added).

However, two features distinguish this case from *Japan Line:* First, unlike Japan Line, Ltd., Itel is a domestic American corporation, and the lease of its containers delivered in Tennessee are not taxed abroad; thus, the sales tax imposed by Tennessee creates no multiple international taxation in fact. The *Japan Line* Court recognized that foreign-owned shipping containers are distinguishable from domestically-owned containers, for the Court stated: "[W]e do not reach questions as to the taxability ... of domestically-owned instrumentalities engaged in foreign commerce." *Japan Line,* 99 S.Ct. at 1819, fn. 7. Second, *Japan Line* concerned a direct ad valorem property tax on the value of the containers, while Itel challenges the validity of a sales tax assessed upon the proceeds of leases of containers delivered in Tennessee. Since a state tax which discriminates against domestically-owned containers by exempting foreign-owned containers raises serious Equal Protection problems, we decline to consider the domicile of the owner of the containers as relevant.

As a threshold question, therefore, we consider whether the property tax held invalid in *Japan Line* is distinguishable from the sales tax assessed against Itel for the purpose of determining the constitutionality of the tax. Itel insists, of course, that the two taxes are not distinguishable, citing *Xerox Corporation v. Harris County, Texas,* 459 U.S. 145, 103 S.Ct. 523, 74 L.Ed.2d 323 (1982), *McGoldrick v. Gulf Oil Corporation,* 309 U.S. 414, 60 S.Ct. 664, 84 L.Ed. 840 (1940), *Ritchfield Oil Corp. v. State Board of Equalization,* 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946), and *Louisiana Land & Exploration Co. v. Pilot Petroleum Corp.,* 900 F.2d 816 (5th Cir.1990), as authority.

In *Ritchfield* and *Louisiana Land,* the Supreme Court and the 5th Circuit Court of Appeals, respectively, found that sales taxes, like property taxes, violate the Import/Export Clause when imposed directly on goods destined for export. Because Tennessee's tax on container leases is not a direct tax on the value of goods destined for export, however, those cases are unpersuasive.

In *Xerox* and *McGoldrick,* the Supreme Court held that both property taxes and sales taxes assessed upon goods held in government-bonded warehouses violated the Supremacy Clause,[3] because "Congress intended to make customs-bonded warehouses federal enclaves free of state taxation." Accordingly, the Court held that "state property taxes on goods stored under bond in a customs warehouse are preempted by Congress' comprehensive regulation of customs duties." The Court found it

> unnecessary ... to consider whether, absent congressional regulation, the taxes here would pass muster under the Import–Export Clause or the Commerce Clause.

*Xerox,* 459 U.S. at 154, 103 S.Ct. at 528.[4]

The Federal Customs Warehouse statutes, 19 U.S.C. §§ 1555 and 1557, differ

---

**2.** Convention between the United States of America and Japan for the Avoidance of Double Taxation (Bilateral Tax Convention), March 8, 1971 [1972], 23 U.S.T. 967, 1084–85, T.I.A.S. No. 7365.

**3.** "This Constitution, and the laws of the United States ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const. art. VI, cl. 2.

**4.** The broad holdings of *Xerox* and *McGoldrick* have since been limited to provide a prohibition of state taxation only of goods destined for

significantly from the statute regulating cargo containers, 19 U.S.C. § 1322. While in bonded warehouses, imported goods are in the joint custody and continuous control and supervision of customs officers of the United States Customs Service and the warehouse proprietor. 19 U.S.C. § 1555(a). "Detailed regulations control every aspect of the manner in which the warehouses are to be operated." *Xerox*, 459 U.S. at 150, 103 S.Ct. at 526; *see* 19 C.F.R. §§ 19.1–19.6 (1982). In contrast, the statute "regulating" cargo containers merely provides that "instruments of international traffic ... shall be granted the customary exceptions from the application of the *customs* laws." 19 U.S.C. § 1322(a) (emphasis added). Cargo containers are neither under the supervision nor in the custody of customs officers.

Clearly, Congress has the power to prohibit state sales taxes on cargo container leases, in order to benefit cargo container companies. In *Xerox*, the Court explicitly held that the customs-bonded warehouse statutes were intended by Congress "to stimulate business for American industry and work for Americans." *Xerox*, 459 U.S. at 451, 103 S.Ct. at 526. In both *Xerox* and *McGoldrick*, the Court found that it would be incompatible

> with the comprehensive scheme Congress enacted to effect [its] goals if the states were free to tax such goods while they were lodged temporarily in government-regulated bonded storage in this country.... First, Congress sought, in the statutory scheme reviewed in *McGoldrick*, to benefit American industry by remitting duties otherwise due. The import tax on crude oil was remitted to benefit oil refiners employing labor at refineries within the United States, whose products would not be sold in domestic commerce. [In *Xerox*], the remission of duties benefited those shippers using American ports as trans-shipment centers. Second, the system of

customs regulation is as pervasive for the stored goods in [*Xerox*] as it was in *McGoldrick* for the refined petroleum. In both cases, the imported goods were segregated in warehouses under continual federal custody and supervision. Finally, the state tax was large enough in each case to offset substantially the very benefits Congress intended to confer by remitting the duty.

*Xerox*, 459 U.S. at 151–53, 103 S.Ct. at 527. In contrast, the Court in *Japan Line* found no Congressional intent to benefit container companies in the statutes regulating cargo containers. In the absence of any such Congressional intent, *Xerox* and *McGoldrick* support the conclusion that Congress has not preempted state sales taxes on the transfer of possession of cargo containers. Therefore, nothing in those cases persuades us that sales taxes are indistinguishable from property taxes.

The United States Supreme Court has held that it "was not the purpose of the Commerce Clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business," *Complete Auto*, 430 U.S. at 288, 97 S.Ct. at 1079, and the Court has endorsed that proposition in the international commerce context. In *R.J. Reynolds Tobacco v. Durham County, N.C.*, 479 U.S. 130, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986), the Supreme Court recognized that "since this imported tobacco receives the same local governmental services, such as police and fire protection, as domestic tobacco, [if the tax is invalidated] local taxpayers would be forced to provide a subsidy in excess of a million dollars to Reynolds." 479 U.S. at 146, 107 S.Ct. at 510. Similarly, in *Department of Revenue v. Association of Washington Stevedoring Company*, 435 U.S. 734, 747, 98 S.Ct. 1388, 1396, 55 L.Ed.2d 682 (1978), the Supreme Court also held that "the Commerce Clause balance tips against the tax only when it unfairly bur-

export. In *R.J. Reynolds Tobacco v. Durham County, N.C.*, 479 U.S. 130, 107 S.Ct. 499, 93 L.Ed.2d 449 (1986), the Court stated:

> It is difficult ... to believe that the purposes in forming the customs-bonded warehouse

scheme identified by the Court in *Xerox* would be disserved by the imposition of *ad valorem* property taxes on Reynold's imported tobacco.

*Id.*, 479 U.S. at 144, 107 S.Ct. at 509.

dens commerce by exacting more than a just share from the interstate [5] activity." The Court then weighed the state's interest in exacting from international commerce "its fair share of the cost of state government" against the burden imposed by the tax on international commerce, and concluded that Washington state's "business and occupation tax" on the discrete activity of loading and unloading ships engaged in interstate and international commerce did not violate the Commerce Clause. *Washington Stevedoring*, 435 U.S. at 748, 98 S.Ct. at 1398.

Moreover, the Supreme Court has recently upheld a state sales tax which burdened foreign commerce. In *Wardair Canada, Inc. v. Florida Department of Revenue*, 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986), the Court applied its *Japan Line* test to determine that Florida's imposition of a sales tax on jet fuel sold to international carriers did not violate the Commerce Clause. Thus, while sales taxes which burden foreign commerce have been upheld (*Wardair*) and a "Business and Occupation" tax on the service of loading and unloading goods in foreign commerce has been upheld (*Washington Stevedoring*) never has a direct *property* tax on goods still in international commerce been upheld. Tennessee's sales tax on the transfer of possession of containers used to move goods in foreign commerce is more analogous to a sales tax on fuel used to move passengers in foreign commerce, and to an occupation tax on the activity of loading and unloading cargo in foreign commerce, than to the direct *ad valorem* property tax imposed by California on Japan Line's cargo containers.

We conclude, therefore, that the sales tax assessed against Itel is distinguishable from a direct *ad valorem* property tax, and we hold that *Japan Line*, while instructive of the appropriate Commerce Clause analysis, is not dispositive of this case. Conse-

quently, we return to the facts of this case and proceed to apply the *Japan Line* test to those facts.

### A. THE COMMERCE CLAUSE [6]

■ The first step in *Japan Line*'s Commerce Clause analysis consists of *Complete Auto*'s four-fold requirements. We are persuaded that Itel's containers have a "substantial nexus" with Tennessee, since they are present within the state at the time of transfer of possession to each lessee, and since the containers are in the custody of Itel's employees and agents in Tennessee. Moreover, the tax is "fairly apportioned," since it is levied only on the proceeds of leases pursuant to which the lessee takes delivery in Tennessee. The tax does not "discriminate," since it falls even-handedly on all leased personal property in the state; and finally, the tax is "fairly related to the services provided by [Tennessee], services that include not only police and fire protection, but also the benefit of a trained work force and the advantages of a civilized society." *Japan Line*, 441 U.S. at 445, 99 S.Ct. at 1820.

■ Itel argues that federal customs regulations, specifically 19 C.F.R. § 1041A(c) and (d), require that bonded cargo containers are to be treated as having never entered the United States. Therefore, since Itel's containers have no "presence" in Tennessee for U.S. Customs purposes, they may not be taxed because the "nexus test" of *Complete Auto* is not satisfied. Essentially, this is a variation of Itel's preemption and Supremacy Clause argument.

The federal statute pursuant to which the customs regulations were adopted, 19 U.S.C. § 1322(a), provides merely that "instruments of international traffic ... shall be granted the customary exceptions from the application of the *customs* laws." (Emphasis added.) The regulations adopted

---

**5.** *Washington Stevedoring* predates *Japan Line*, so the Court made no distinction between interstate and foreign commerce in its Commerce Clause analysis. Nevertheless, the holding of *Washington Stevedoring* applies to both interstate and foreign commerce, and the case was

cited with approval in *Japan Line*, 441 U.S. at 444, 99 S.Ct. at 1819.

**6.** "Congress shall have power ... to regulate commerce with foreign Nations, and among the several states. . . ." U.S. Const. art. I, § 8, cl. 3.

pursuant to that statute, therefore, can go no further than to provide exceptions from federal customs duties. Because Tennessee's sales tax is not a federal customs duty, the customs statute and regulations are inapposite. Cargo containers bonded by the customs agency of the United States Treasury Department may well not be "present" in Tennessee for U.S. Customs purposes; but we hold that Itel's containers are present in the state of Tennessee for Tennessee sales tax purposes.[7] *Williams Rentals, Inc. v. Tidwell, supra,* 516 S.W.2d 614 (Tenn.1974).

Moreover, the same argument was made and disposed of in *R.J. Reynolds, supra,* 479 U.S. at 156, 107 S.Ct. at 515, in the context of goods stored in a government-bonded warehouse. Because we have found that Congress' regulation of cargo containers is less pervasive than its regulation of bonded warehouses, the argument that Congress has preempted state taxation must fail here as well.

We hold that Tennessee's sales tax meets the four-fold requirements of *Complete Auto.* Therefore, we proceed next to consider the additional two-part test articulated in *Japan Line* for determining whether a state tax on the instrumentalities of foreign commerce violates the Commerce Clause.

■ The first such question is whether the tax creates an enhanced risk of multiple international taxation. In *Wardair Canada, Inc. v. Florida Department of Revenue,* 477 U.S. 1, 106 S.Ct. 2369, 91 L.Ed.2d 1 (1986), *supra,* the Court summarily dismissed the possibility that a sales tax on jet fuel sold to international carriers created an enhanced risk of multiple international taxation:

> [T]here is no threat of multiple international taxation in this case, since the tax

is imposed only upon ... a *discreet transaction* which occurs within one national jurisdiction only.

*Id.,* 477 U.S. at 9, 106 S.Ct. at 2373 (emphasis added).

Other nations very well may adopt similar taxes on the transfer of possession of leased containers within their taxing jurisdictions. However, we hold that the transfer of possession of cargo containers in Tennessee is a discrete transaction, occurring only within Tennessee, which creates no risk of multiple international taxation.[8]

■ The second test for validity of state taxation of instruments of foreign commerce articulated in *Japan Line* is whether the tax "prevents the federal government from speaking with one voice when regulating commercial relations with foreign governments." In *Department of Revenue v. Association of Washington Stevedoring Companies, supra,* 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), the Court held that:

> the assessments in this case are only upon business conducted entirely within Washington. No foreign business or vessel is taxed. Respondents, therefore, have demonstrated no impediment posed by the tax upon the regulation of foreign trade by the United States.

*Id.,* 435 U.S. at 754, 98 S.Ct. at 1401. Likewise, Itel has demonstrated no impediment posed by Tennessee's tax upon the regulation of foreign trade by the U.S. government.

In *Japan Line,* the Court identified three reasons for its elaborate Commerce Clause analysis:

> A state tax on instrumentalities of foreign commerce may frustrate the achievement of federal uniformity in several ways. If the state imposes an ap-

---

7. This disposes also of Itel's argument that the sales tax violates the Due Process Clause of the Fourteenth Amendment, which has been construed to permit state taxation on the basis of "the habitual employment of ... property within the state." *Braniff Airways v. Nebraska State Board of Eq. & A.,* 347 U.S. 590, 601, 74 S.Ct. 757, 764, 98 L.Ed. 967 (1954) (citation omitted).

8. The fact that other jurisdictions might tax other transactions involving these containers is irrelevant. For example, other nations may impose landing fees on Wardair Canada's jets, or sales taxes on the passenger tickets; this clearly is not what is meant by "multiple international taxation" in *Wardair* or *Japan Line,* or by "double taxation" in the Bilateral Tax Convention, *supra,* at fn. 3.

portioned tax, international disputes over reconciling apportionment formulae may arise. If a novel state tax creates an asymmetry in the international tax structure, foreign nations disadvantaged by the levy may retaliate against American-owned instrumentalities present in their jurisdictions. Such retaliation of necessity would be directed at American transportation equipment in general, not just that of the taxing state, so that the nation as a whole would suffer. If other states followed the taxing state's example, various instrumentalities could be subject to varying degrees of multiple taxation, a result that would plainly prevent this nation from speaking with one voice in regulating foreign commerce.

*Japan Line,* 441 U.S. at 450–51, 99 S.Ct. at 1822–23. None of these concerns are implicated by a sales tax on a discrete transaction occurring only in one jurisdiction. *Wardair, supra; Washington Stevedoring, supra.*

Because Tennessee's sales tax is imposed upon the discrete transaction of the transfer of possession of leased cargo containers in Tennessee, we find that the sales tax will not hinder the policies embodied in the Customs Convention on Containers, impair uniformity where essential, or prevent the Federal Government from speaking with one voice when regulating commercial relations with foreign governments. Consequently, we hold that the tax assessed against Itel is not prohibited by the Commerce Clause.

## B. THE IMPORT/EXPORT CLAUSE [9]

█ Relying on *Richfield Oil Corp. v. State Board of Equalization,* 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946), Itel also contends that the Tennessee sales tax violates the Import/Export Clause.

*Richfield* has never been overruled by the United States Supreme Court. However, in *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 96 S.Ct. 535 [46 L.Ed.2d 495] (1976), the Court initiated a new approach to the Import/Export Clause.... The *Michelin* Court focused on the nature of the [state] tax. Specifically, the Court outlined three policies that were to be served by the Clause.

First, the federal government must speak with one voice when regulating commercial relations with foreign governments.... Second, import revenues were to be the major source of revenue for the federal government and should not be diverted to the states. Finally, harmony among the states might be disturbed unless seaboard states, with their crucial ports of entry, were prohibited from levying taxes on citizens of other states by taxing goods merely flowing through their ports to the other states not situated as favorably geographically. *Michelin,* 423 U.S. at 285–86, 96 S.Ct. at 540–41.

*Louisiana Land & Exploration v. Pilot Petroleum,* 900 F.2d 816, 819 (5th Cir. 1990).

In *Department of Revenue v. Stevedoring Association, supra,* 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), the Court applied the *Michelin* three-prong policy test, and found that none of those policies were threatened by Washington's business and occupation tax on the discrete service of loading and unloading ships in international commerce. Specifically, the federal government's ability to conduct foreign policy was not affected, because the tax was assessed against all businesses, upon discrete transactions occurring wholly within the state. Federal import revenues were not affected, because Washington taxed only the value of the loading and unloading of the goods, not the value of the goods themselves, and since the tax only compensated the government for providing protective services, it would not disturb harmony among the states. Most important to the Court was the indirect nature of the tax,

---

**9.** "No state shall, without the consent of the congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws: and the net produce of all duties and imposts, laid by any state on imports or exports, shall be for the use of the treasury of the United States; and all such laws shall be subject to the revision and control of the congress." U.S. Const. art. 1, § 10, cl. 2.

the fact that the tax did not relate to the value of the goods, and the fact that the tax was applied to discrete services provided wholly within the state.

We have carefully considered the "one voice" test as part of our Commerce Clause analysis, above, and concluded Tennessee's tax meets this test. Like the business of stevedoring, the transfer of possession of cargo containers is a discrete transaction which does not impair the federal government's ability to speak with one voice in its conduct of foreign policy.

Federal import revenues are not affected, because Tennessee only taxes the lease proceeds on containers delivered here, not the value of the goods themselves. Tennessee's tax only compensates the state for providing protective services, so the tax will not disturb harmony among the states. Moreover, the indirect nature of the tax distinguishes it from the direct taxes held invalid in *Xerox* and *McGoldrick*. For these reasons, we hold that Tennessee's sales tax, as applied to the transfer of possession of cargo containers in Tennessee, does not violate the Import/Export Clause.

## CONCLUSION

We have held that the Tennessee Department of Revenue has statutory authority to tax the transfer of possession of cargo containers in Tennessee, and that the imposition of that tax upon Itel does not violate the Commerce, Import/Export, Supremacy, or Due Process Clauses of the United States Constitution. Consequently, the judgment of the Chancellor is affirmed. Costs are taxed to the appellant.

REID, C.J., and DROWOTA, O'BRIEN and DAUGHTREY, JJ., concur.